# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2444

_____

| | |
|---|---|
| ACLU Nebraska Foundation; John Doe, | * * * |
| Plaintiffs - Appellees, | * |
| v. | * Appeal from the United States * District Court for the * District of Nebraska. |
| City of Plattsmouth, Nebraska, | * * |
| Defendant - Appellant. | * |
| _____ | * * |
| State of Nebraska, | * * |
| Amicus on Behalf of Appellant. | * * * |
| Americans United for Separation of Church and State, | * * * |
| Amicus on Behalf of Appellee. | * * |

_____

Submitted:  January 15, 2003

Filed:  February 18, 2004 (corrected 2/20/04)

_____

Before BOWMAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

A resident of the City of Plattsmouth and the ACLU Nebraska Foundation allege Plattsmouth's display of a Ten Commandments monument violates the Establishment Clause of the United States Constitution. The district court[1] found the Ten Commandments monument violates the Establishment Clause and granted appellees' motion for summary judgment. Plattsmouth appeals.

I

the Ten Commandments
I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven image.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day to keep it holy.
Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife nor his manservant nor his maidservant, nor his cattle nor anything that is thy neighbor's.

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

So reads the approximately five-foot-tall granite monument at issue in this lawsuit. Above the inscription are two small tablets engraved with the Ten Commandments written in a Semitic script,[2] an eye within a triangle,[3] and an eagle gripping an American flag. Below it are two six-point stars,[4] the intertwined symbols "chi" and "rho"[5] and a small scroll reading, "PRESENTED TO THE CITY OF PLATTSMOUTH NEBRASKA BY FRATERNAL ORDER OF EAGLES PLATTSMOUTH AERIE NO.365 1965."

Other than the scroll's reference to Plattsmouth, the monument bears a very close resemblance to scores of other Ten Commandments monuments given by the Fraternal Order of the Eagles to towns and cities in the 1950s and 1960s. See, e.g., Van Orden v. Perry, 351 F.3d 173, 175-76 (5th Cir. 2003) (describing an Eagles monument on the Texas capitol grounds); Adland v. Russ, 307 F.3d 471, 475-76 (6th Cir. 2002), cert. denied, 123 S.Ct. 1909 (2003) (describing an Eagles monument on the Kentucky capitol grounds); Summum v. Ogden, 297 F.3d 995, 997-98 (10th Cir.

---

[2]See Henry S. Noerdlinger, Moses and Egypt 38-43 (University of Southern California Press 1956) (discussing languages of the late Bronze Age, with photograph of nearly identical Ten Commandments monument created by Ralph Marcus of the Oriental Institute of the University of Chicago). The District Court identified the Semitic language as Hebrew, Plattsmouth's briefs say it is Phoenician, but Moses and Egypt describes the language as "early Canaanite." Id. at 40. It matters not which Semitic language is reproduced on the small tablets; for the purposes of this discussion it matters only that they purport to be a replica of the original Ten Commandments.

[3]This image is also referred to as the Egyptian "all-seeing eye" and can be seen atop a pyramid on the back of a dollar bill.

[4]The six-point star is the Star of David, a symbol of the Jewish religion.

[5]The Greek letters "chi" and "rho" are used to symbolize Christ in the Christian religion.

2002) (describing an Eagles monument in Utah); <u>Books v. Elkhart</u>, 235 F.3d 292, 296 (7th Cir. 2000) (describing an Eagles monument in Indiana); <u>Christian v. Grand Junction</u>, No. 01-CV-685, 2001 WL 34047958, *1 (D. Co. June 27, 2001). The Seventh Circuit's opinion in <u>Books</u> recounts the history of the Eagles's Ten Commandments project, which begins with a Minnesota juvenile court judge who saw the Ten Commandments as the cure for juvenile delinquency, and includes the involvement of Hollywood producer Cecil B. DeMille, who was promoting his movie THE TEN COMMANDMENTS. <u>Id.</u> at 294-95; <u>see also</u> <u>State v. Freedom From Religion Found., Inc.</u> 898 P.2d 1013, 1017 (Col. 1995).

The Ten Commandments monument belongs to Plattsmouth. The monument stands in Memorial Park ten blocks from Plattsmouth City Hall. The park, at forty-five acres the largest park in the City, is also owned by Plattsmouth. The monument sits under shady trees on a grassy knoll between a recreation area (containing a barbeque grill, benches, picnic tables, and a permanent shelter) and a road. Although the inscribed side faces the road, it is too far away to be read by passing motorists. Pedestrians, picnickers, and others using the park, however, have an unrestricted view of the Ten Commandments as written on the monument. Other than mowing grass around its concrete base the monument requires no regular maintenance. When the monument is in need of cleaning or repair, however, City of Plattsmouth employees perform those duties. On at least one occasion since this litigation commenced, the monument was toppled over and City employees re-erected it.

Permanent markers may not be placed in the park without the permission of Plattsmouth. The City has no formal policy regarding the acceptance of permanent markers; rather, it makes such decisions on a case-by-case basis. No other monument, statue or the like is within eyeshot of the subject monument. A large plaque containing the names of donors is located by the main entrance to the park. Individual pieces of recreational equipment, such as grills and benches, bear plaques identifying their donors.

No contemporaneous City resolutions, minutes, proclamations or other records survive from the period, so there is little evidence of the process by which the monument was accepted and installed. What is known is the following: the Eagles donated the monument to Plattsmouth in 1965. The Eagles is a national organization responsible for many philanthropic and community-enhancing contributions to Plattsmouth. The Eagles chose the words and symbols and had them engraved on the monument. The Ten Commandments, also referred to as the Decalogue, are an amalgam of those used in the Protestant, Catholic and Jewish religions. Then Street Commissioner Art Hellwig and other Plattsmouth employees erected the monument. It is not known whether these City employees were acting in their personal or official capacities when they erected the monument. It is known, however, that Hellwig was an officer of the Eagles at the time.

John Doe is a Plattsmouth resident who comes into frequent unwelcome contact with the monument. Doe is an atheist and as such does not share the religious beliefs expressed on the monument. The monument alienates Doe and makes him feel like a second-class citizen. He lives near the monument and drives by it frequently. Although the letters are too small to be read from the street, Doe is reminded of its message every time he drives by. Because of the monument, Doe avoids using the park for recreational activities except when a scheduled event requires his presence. He would use the park more often were it not for the monument.

John Doe is a donor to and member of the ACLU Nebraska Foundation. The ACLU is a membership organization whose stated purpose is defending citizens' constitutional rights. Its members hold a variety of religious views. The ACLU has over 800 members in Nebraska, including twelve in Cass County, of which Plattsmouth is the county seat. Some of these members come into direct and unwelcome contact with, and are deeply offended by, the monument. The ACLU

participated in this action to assert the rights and interests of its local members, including those of John Doe.

II

Before we reach the question of whether Plattsmouth's display is unconstitutional, we must answer the threshold question of whether Doe and the ACLU have standing to bring their Establishment Clause claim. Tarsney v. O'Keefe, 225 F.3d 929, 934 (8th Cir. 2000) ("Standing is the threshold question in every federal case. . . .") (internal quotation and citation omitted). Standing is a jurisdictional requirement; if Doe and the ACLU have no standing to bring this claim the district court had no power to consider the monument's constitutionality, and neither does this court. See id.; Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 475-76 (1982) ("[O]f one thing we may be sure: Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States."). The district court found Doe and the ACLU have standing to bring this action, a decision we now review de novo. Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 689 (8th Cir. 2003).

Parties invoking federal jurisdiction, here Doe and the ACLU, have the burden of establishing standing. Schanou v. Lancaster County Sch. Dist., 62 F.3d 1040, 1045 (8th Cir. 1995).[6] The standing doctrine incorporates both constitutional requirements and prudential considerations, and serves to limit federal jurisdiction to "cases" and "controversies" as required by Article III of the U.S. Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61 (1992). The constitutional prerequisite has been distilled into the following test:

---

[6]Doe mentions in his brief his status as a taxpayer but does not rely upon it to establish standing. We therefore do not consider whether Doe has taxpayer standing to pursue this action.

First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 560-61 (internal quotations and citations omitted).

A plaintiff may also be denied standing, even if he meets the Article III standing requirements, if he runs afoul of certain judicially-constructed prudential limits on standing. Valley Forge, 454 U.S. at 474-75. These prudential concerns include limiting standing to cases where the plaintiff asserts his own rights and interests, not those of third parties, Warth v. Seldin, 422 U.S. 490, 499 (1975), and where the complaint falls within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970). The final prudential limitation on standing teaches that a plaintiff has no standing to assert "abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 475 (quotation marks omitted).

We begin by addressing Doe's Article III standing. Doe has direct personal offensive contact with Plattsmouth's display of the Ten Commandments and avoids the park because of it. These undisputed facts meet the second and third Article III standing requirements of causation and redressability; Plattsmouth's display is causing the injuries of which Doe complains, and the varied relief at the judiciary's disposal could redress the injuries. The closer question in this case, as it often is with

Establishment Clause claims alleging only non-economic injury, is the first element requiring an injury in fact.

If a plaintiff has not suffered a judicially cognizable injury, there is no standing and the court is without jurisdiction to consider the action. Tarsney, 25 F.3d at 934. The injury-in-fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation – even though small – from a person with a mere interest in the problem." United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1972). No governing precedent describes the injury in fact required to establish standing in a religious display case such as this. The Eighth Circuit case of Am. Civil Liberties Union v. Florissant is of no help because the basis for standing is not described, much less discussed or ruled upon. 186 F.3d 1095, 1098 (8th Cir. 1999) (holding a holiday display did not violate the Establishment Clause). The more recent case of Doe v. Sch. Dist. of Norfolk held a student had no standing to assert an Establishment Clause claim based on his public high school's announcement that a graduation ceremony would include a religious invocation and benediction because the invocation and benediction were cancelled. 340 F.3d 605, 609-10 (8th Cir. 2003). Norfolk stands for the proposition the alleged establishment of religion must actually occur in order to have caused an injury; the announcement, by itself, caused no injury. In the case at bar, Plattsmouth did more than announce its intent to display the Ten Commandments; the City displayed them, so Norfolk does not apply. The only other decision of this Court touching on this question is Flora v. White, 692 F.2d 53, 54 (8th Cir. 1982). Flora held atheists lacked standing to challenge an Arkansas constitutional provision barring anyone who denied "the being of a God" from holding public office or testifying in court, because the requirement had never been applied against the plaintiffs who were merely suing on principle. Doe, however, is not merely suing on principle, so Flora is not controlling here.

In the absence of a governing injury-in-fact standard, Plattsmouth has suggested one. Plattsmouth argues Doe suffered no injury in fact because Plattsmouth did not eject him from the park, tax him disparately, force him to read the Ten Commandments, force him to pray, or otherwise take action against him because of his atheism. Such allegations would certainly amount to an injury in fact sufficient to create standing to pursue an Establishment Clause claim. But standing is not limited to cases with injuries as egregious as those suggested by appellant. See, e.g., Lee v. Weisman, 505 U.S. 577, 604 (1992) (Blackmun, J., concurring) ("Although our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient."); Comm. for Pub. Educ. v. Nyquist, 413 U.S. 756, 786 (1973) ("The absence of any element of coercion, however, is irrelevant to questions arising under the Establishment Clause."); Sch. Dist. of Abington Township v. Schempp, 374 U.S. 203, 224 n.9 (1963) ("But the requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed."); Engel v. Vitale, 370 U.S. 421, 430 (1962) ("The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not."); Tarsney, 225 F.3d at 935 (quoting Engel); but see Bd. of Educ. of the Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 259-60 (1990) (Justice Kennedy, concurring) (rejecting endorsement test in favor of a coercion test).

Plattsmouth quotes as apposite the Supreme Court's statement in Valley Forge that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury sufficient to confer standing. 454 U.S. at 485-86. But Valley Forge does not live up to its billing as requiring coercion to establish standing. In Valley Forge the government had transferred surplus property to religious organizations without payment. The plaintiffs read an account of the transfer in a press release and sued because they believed the government's acts to be

an establishment of religion.  But the plaintiffs in <u>Valley Forge</u> alleged no injury whatsoever to themselves as a consequence of the government acts.  In fact, they experienced no direct contact with the alleged establishment of religion; they merely objected to the government's action on principle.  <u>Valley Forge</u> makes clear that claiming the government has acted unlawfully, without having suffered a personal injury, does not satisfy the standing requirements.  <u>Id.</u>  This lesson of <u>Valley Forge</u> is received wisdom, but it does not support the high bar Plattsmouth would have us set.

In fact, Doe easily meets <u>Valley Forge</u>'s standing test.  He does not merely ask the federal courts to declare a governmental action unconstitutional on an academic or ideological principle; Doe is asking the federal courts to stop Plattsmouth's act because of what it does *to him*.  Doe's is not the mere vindication of a public grievance, but an allegation of government establishment of religion to which he, personally and directly, has been subjected.  Doe has therefore suffered an injury of a nature and to a degree the <u>Valley Forge</u> plaintiffs did not.  We are "satisfied that a genuine controversy exists and that [Doe] has something more personal to gain from victory in the lawsuit than the mere ideological or psychological satisfaction of upholding the Constitution." <u>Warth</u>, 422 U.S. at 498-99.

After rejecting the injury-in-fact test proposed by Plattsmouth, we are left with the question of what standard we should apply.  As explained by the district judge, two views have emerged in this regard.  <u>See, e.g.</u>, Marc Rorh, <u>Tilting at Crosses: Nontaxpayer Standing to Sue Under the Establishment Clause</u>, 11 Ga. St. U. L. Rev. 495, 510-19 (1995) (explaining the two views).  The more demanding test requires a plaintiff to prove, at a minimum, he altered his behavior to avoid the allegedly unconstitutional display.  <u>Freedom from Religion Found., Inc. v. Zielke</u>, 845 F.2d 1463, 1467-68 (7th Cir. 1988) (denying standing to challenge Ten Commandments

display in a public park to residents who "concede[d] that they did not alter their behavior in any manner as a result of the Ten Commandments monument . . . .").[7]

By far the prevailing view requires only direct and unwelcome personal contact with the alleged establishment of religion. See, e.g., Adland, 307 F.3d at 478 (holding, in an Eagles Ten Commandments monument case, "[a]n Establishment Clause plaintiff need not allege that he or she avoids, or will avoid, the area containing the challenged display."); Books, 235 F.3d at 301 ("We therefore conclude that a plaintiff may allege an injury in fact when he is forced to view a religious object that he wishes to avoid but is unable to avoid because of his right or duty to attend the government-owned place where the object is located."); Suhre v. Haywood County, 131 F.3d 1083, 1087-88 (4th Cir. 1997) (rejecting the view plaintiffs must alter their behavior to incur injury in fact, concluding "neither Supreme Court precedent nor Article III imposes such a change-in-behavior requirement. . . . Rules of standing that require plaintiffs to avoid public places would make religious minorities into outcasts."); Foremaster v. St. George, 882 F.2d 1485, 1490-91 (10th Cir. 1989) (holding plaintiff had standing by alleging direct personal contact with offensive municipal conduct even though he did not contend he changed his behavior); Saladin v. Milledgeville, 812 F.2d 687, 692 (11th Cir. 1987) (holding city residents had standing to challenge the city's placement of the word "Christianity" on its official seal because they regularly received correspondence bearing the seal and the seal made them feel like second-class citizens); Am. Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, 698 F.2d 1098, 1107-08 (11th Cir. 1983) (holding one plaintiff had standing to challenge a large cross in a state park solely "because the cross [was] clearly visible from the porch of his summer cabin as well as from the roadway he must use . . . .").

---

[7]It appears likely the Seventh Circuit has disowned the "altered behavior" test and distinguished this language contained in Zielke. See Doe v. Montgomery, 41 F.3d 1156, 1160-61 (7th Cir. 1994); Books, 235 F.3d at 299-300.

Doe experiences direct, offensive and alienating contact with the Ten Commandments monument displayed by Plattsmouth. That the injuries are caused by Doe's own City is all the more alienating. See Am. Civil Liberties Union v. St. Charles, 794 F.2d 265, 268 (7th Cir. 1986) ("Maybe it ought to make a difference if (as here) a plaintiff is complaining about the unlawful establishment of a religion by the city, town, or state in which he lives, rather than about such an establishment elsewhere."). In addition to the direct contact, Doe avoids using the park, and in particular the part of the park in which the monument stands. Indeed, Doe would use the park more often if the monument were not there. In toto these injuries meet both the prevailing "direct and unwelcome contact" test and the more demanding but disfavored "altered behavior" test, so we need not choose between them. See also Glassroth v. Moore, 335 F.3d 1282, 1292-93 (11th Cir. 2003) (holding two plaintiffs who assumed burdens to avoid Ten Commandments monument had standing, and not deciding whether third plaintiff who had not assumed any burdens had suffered sufficient injury in fact to establish standing). We hold only that Doe's injuries are concrete in nature, particularized to Doe, actual and ongoing, and not merely conjecture or hypothetical, and therefore judicially recognizable injuries in fact. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). Moreover, Doe's injuries are redressable by the federal courts, and therefore satisfy the "case" or "controversy" requirement of Article III. Lujan, 504 U.S. at 560.

Next are the prudential standing concerns. Government establishment of religion causes very real injuries of the sort experienced by Doe: official alienation, perceived political diminution and pressure to conform one's views to those of the majority. See Suhre, 131 F.3d at 1086 ("the Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss. Rather the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion.") (internal quotation omitted); see also County of Alleghany v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 595 (1989); Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring) ("Endorsement sends

a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."). To demand greater injury than that suffered by Doe would belittle the effect of government proselytization on nonadherents of the religion or religions championed. The injuries of which Doe complains fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," the prohibition on government establishment of religion. Ass'n of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 153 (1970).

Doe asserts his own interests in this suit, not those of third parties. The question of separation of church and state is of "wide public significance," to be sure. But Doe's assertion of his right not to be injured by government establishment does not amount to a "'generalized grievance[]' pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 474-75; Flast v. Cohen, 392 U.S. 83, 106 (1968). Indeed, Doe's very status as a religious minority means his injuries are unlikely to be pervasively shared. This is precisely the sort of grievance for which the federal courts are best suited; the representative branches are less equipped to disobey the wishes of a passionate majority whose religious views are being established. In summation, the prudential standing considerations do not weigh against Doe bringing this lawsuit and we conclude Doe has standing.

An association like the ACLU has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Friends of the Earth, 528 U.S. at 181. Doe is a member of the ACLU and, for the reasons explained above, he has standing to sue, as would other members making the same allegations. The interests at stake are germane to the ACLU's purpose of defending citizens' constitutional rights. Neither

the claim asserted nor the relief requested require the participation of ACLU members. We therefore conclude the ACLU has standing to pursue this action.

III

Having successfully crossed the threshold of standing, we next address the merits. Doe and the ACLU claim Plattsmouth's display of the Ten Commandments monument violates the Establishment Clause of the First Amendment.[8] The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I. Originally the Establishment Clause barred only Congress from establishing religion, but it has since been applied to the states through the Fourteenth Amendment. Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947); Tarsney, 225 F.3d at 935. The First Amendment to the U.S. Constitution therefore prohibits Plattsmouth from making any laws "respecting an establishment of religion . . . ."

The first task of this court is to choose the appropriate test for this Establishment Clause challenge. See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 720 (1994) (O'Connor, J., concurring) ("Experience proves that the Establishment Clause, like the Free Speech Clause, cannot easily be reduced to a single test."). The district court applied the test first announced in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), and found the monument violates the Establishment Clause. Doe and the ACLU would prefer this court affirm the decision of the district court, but doing so under Larson v. Valente, 456 U.S. 228, 244 (1982)

_____

[8]In the proceedings below, Doe and the ACLU also claimed the display violated Article I, § 4 of the Nebraska Constitution. The district court, noting Nebraska law is undeveloped on the questions presented, concluded comity favored allowing the Nebraska courts to develop the relevant state law. The district court therefore dismissed the Nebraska constitutional claim without prejudice. Neither party takes issue with this ruling by the district court so we do not address it.

("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

When deciding whether government action violates the Establishment Clause, we first determine whether the challenged government action discriminates among religions. Children's Healthcare Is A Legal Duty, Inc. v. Min De Parle, 212 F.3d 1084, 1090 (8th Cir. 2000); see also, Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 695 (1989). If it does, we apply Larson and review the government action with the "strict scrutiny" standard, under which it "must be invalidated unless justified by a compelling government interest and unless closely fitted to further that interest." Larson, 456 U.S. at 246-47 (citation omitted). If the challenged government action does not discriminate among religions, we apply Lemon. Children's Healthcare, 212 F.3d at 1090.

The first question to be answered, then, is whether Plattsmouth's monument is a government activity that discriminates among religions – a practice also known as "religious gerrymandering." E.g., Children's Healthcare, 212 F.3d at 1091. To trigger Larson strict-scrutiny review, the challenged law need not expressly discriminate between religions by sect name, rather, such discrimination may be demonstrated by objective factors such as legislative history and practical effect while in operation. See Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 534-35, 540 (1993); Larson, 456 U.S. at 254. The question, however, is what kind of discrimination triggers Larson.

Doe and the ACLU contend Larson applies because Plattsmouth's monument facially favors certain religious views while discriminating against others. The choice of Commandments does indeed express religious preference. See Glassroth, 335 F.3d at 1285 n.1; Steven Lubet, The Ten Commandments in Alabama, 15 Const. Comment. 471, 474 (1998) (describing some of the differences in Commandments according to different faiths). Even among religions in general agreement about the source and

-15-

importance of the Ten Commandments, there is deep and divisive disagreement about their content.  Id. at 476-77 ("To the faithful, scripture matters."); see also E.J. Dionne Jr., The Third Stage: New Frontiers of Religious Liberty, in What's God Got to Do with the American Experiment 117 (E.J. Dionne Jr. & John J. Dilulio Jr., eds. 2000) (discussing shifting views on the separation between church and state and noting, "in 1844, . . . six people were killed in a riot in Philadelphia over what version of the Ten Commandments should be posted in public schools.").  Additionally, the monument snubs polytheistic sects, such as Hinduism, as well as non-theistic sects, such as Buddhism, and the non-religious.  Every religious belief expressed by the monument is a rejection of contrary views.  If expressing a religious view, and thereby preferring such a view over others, amounts to discrimination worthy of Larson strict scrutiny review, then this monument qualifies.  But then so does every government religious expression.  Applying Larson so broadly would swallow Lemon whole.

So, when should we apply strict scrutiny review pursuant to Larson and when should we apply Lemon?  The Supreme Court has said "the Lemon v. Kurtzman 'tests' are intended to apply to laws affording a uniform benefit to *all* religions,  and not to provisions . . . that discriminate *among* religions."  Larson, 456 U.S. at 252 (footnote omitted) (emphasis in original).  In Larson, the Supreme Court invalidated a statute imposing registration and reporting requirements upon only those religious organizations soliciting more than 50% of their funds from nonmembers, in part because the statute was "drafted with the explicit intention of including particular religious denominations and excluding others." 456 U.S. at 254.  In Children's Healthcare, a divided panel of this court considered applying Larson to a law allowing people with religious objections to medical care to receive government assistance for non-medical care rendered at secular institutions, but declined on the ground the law was facially neutral and not intended to benefit any particular sect. 212 F.3d at 1090-92.  No Eighth Circuit decision has applied strict scrutiny review pursuant to Larson.

-16-

Most courts having applied Larson did so when the challenged government action created a practical, tangible benefit or burden for adherents of a specific religion. See, e.g., Larson, 456 U.S. at 246-51; Sklar v. Comm'r Internal Revenue, 282 F.3d 610, 618-19 (9th Cir. 2002) (applying Larson to invalidate IRS policy allowing Church of Scientologists certain tax deductions disallowed people of other faiths); Wilson v. Nat'l Labor Relations Bd., 920 F.2d 1282, 1286-87 (6th Cir. 1990) (applying Larson to strike down section of NLRA conferring a benefit on members of the religious organizations described in the statute).

Where government action amounts to no more than religious expression, however, courts have applied Lemon. See, e.g., Glassroth, 335 F.3d at 1295 (applying Lemon to hold Ten Commandments monument violated Establishment Clause); Freethought Soc'y of Greater Pa. v. Chester County, 334 F.3d 247, 267-69 (3d Cir. 2003) (applying Lemon (as well as separate endorsement test) and holding Ten Commandments plaque did not violate Establishment Clause); King v. Richmond County, 331 F.3d 1271, 1275-76 (11th Cir. 2003) (applying Lemon to question of whether outline of stone tablets representing the Ten Commandments on court clerk's seal violated the Establishment Clause); Adland, 307 F.3d at 479 (applying Lemon to an Eagles Ten Commandments monument); Books, 235 F.3d at 298 (same); Saladin, 812 F.2d at 694 (directing district court on remand to apply Lemon to decide if city's placement of the word "Christianity" on its official seal violated the Establishment Clause). The Supreme Court notably declined to apply Larson strict scrutiny review to a city's ownership and display of a Nativity scene in a holiday display because it was "unable to see [the] display, or any part of it, as explicitly discriminatory in the sense contemplated in Larson." Lynch, 465 U.S. at 687 n.13.

We conclude Plattsmouth's religious expression does not "discriminate" among religions so as to trigger Larson strict scrutiny review. See Bd. of Ed. of Kiryas, 512 U.S. at 720 (O'Connor, J., concurring) ("Cases involving government speech on religious topics . . . seem to me to fall into a different category and to require an

-17-

analysis focusing on whether the speech endorses or disapproves of religion, rather than on whether the government action is neutral with regard to religion."); Separation of Church and State Comm. v. Eugene of Lane County, 93 F.3d 617, 623 (9th Cir. 1996) (O'Scannlain, J., concurring) ("Larson's strict scrutiny approach is limited to cases where a government statute or practice explicitly discriminates against a certain religious group."). Therefore, Plattsmouth's monument does not trigger strict scrutiny review, and we shall apply the three-part test originally set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). Florissant, 186 F.3d at 1097 (citing Good News/Good Sports Club v. Sch. Dist. of Ladue, 28 F.3d 1501, 1508 (8th Cir. 1994)). Although some have soured on part or all of Lemon, see, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 398-99 (1993) (Scalia, J., dissenting) (collecting opinions of the Supreme Court Justices who have expressed disapproval of some or all of Lemon), it is good law and binds this court. Id. at 389 n.7 ("Lemon, however frightening it may be to some, has not been overruled.").

Under the Lemon test, a law is permissible under the Establishment Clause only if: (1) it has a secular legislative purpose, (2) its primary or principal effect is neither to advance nor to inhibit religion, and (3) it does not foster excessive government entanglement with religion. Florissant, 186 F.3d at 1097; Children's Healthcare, 212 F.3d at 1093. The challenged law is constitutional only if it satisfies all three inquiries. Clayton v. Place, 884 F.2d 376, 379 (8th Cir. 1989). These questions are "in large part . . . legal question[s] to be answered on the basis of judicial interpretation of social facts," rather than upon factual findings in individual cases. Lynch, 465 U.S. at 694 (O'Connor, J., concurring).

Four courts of appeal and one state supreme court have considered whether public ownership and display of an Eagles Ten Commandments monument passes the Lemon test. The monuments in those cases were nearly identical to the Plattsmouth monument, but each had been placed in a slightly different setting. First, in 1973, the

Tenth Circuit concluded an Eagles Ten Commandments display was secular in purpose and effect, despite the fact that one purpose was to "inspire the rule of God," because "at the same time secular purposes were also emphasized." Anderson v. Salt Lake City Corp., 475 F.2d 29, 33 (10th Cir. 1973). In 1995, the Supreme Court of Colorado concluded there was neither religious purpose in, nor religious effect from, an Eagles monument because (1) the version of Ten Commandments used was not that of any particular sect, (2) the monument included various secular and sacred symbols of different religions, and (3) the Eagles's purpose for donating the monument was secular – specifically, providing a code of behavior for wayward youth. State v. Freedom From Religion Found., Inc., 898 P.2d 1013 (Col. 1995). Also in 1995, the Seventh Circuit held an Eagles monument did violate the Establishment Clause because neither its purpose nor its primary effect were secular. Books, 235 F.3d at 302 ("As a starting point, we do not think it can be said that the Ten Commandments, standing by themselves, can be stripped of their religious, indeed sacred, significance and characterized as a moral or ethical document."). A different panel of the Seventh Circuit came to the same conclusion with respect to another Eagles monument in 2001 in Ind. Civil Liberties Union v. O'Bannon, 259 F.3d 766, 770 (7th Cir. 2001), cert. denied, 534 U.S. 1162 (2002). In 2002, the Sixth Circuit held a state's plan to relocate an Eagles monument to a permanent site as part of a historical and cultural display on state land violated the Establishment Clause because it had a primarily religious purpose and impermissibly endorsed religion. Adland, 307 F.3d at 483-84, 88-89. Most recently, the Fifth Circuit concluded an Eagles monument that was one of seventeen monuments displayed on the Texas capitol grounds did not violate the Establishment Clause. Van Orden, 351 F.3d at 182. Even considering the different factual contexts of these monuments, it would appear the decisions of the Fifth and Tenth Circuits and the Colorado Supreme Court are in conflict with those of the Seventh and Sixth Circuits. Adding to this division are recent decisions involving non-Eagles Ten Commandments monuments. In Freethought Soc'y, the Third Circuit found an eighty-year-old brass plaque listing the Ten Commandments did not endorse religion and withstood the Lemon test. 334 F.3d

at 270. The Eleventh Circuit, however, in <u>Glassroth</u> found a washing-machine sized monument of the Ten Commandments installed in the Montgomery, Alabama, judiciary building violated both the purpose and effect prongs of <u>Lemon</u>. 335 F.3d at 1293. Whether falling to one side of the debate or the other, each of these decisions adds to the body of Establishment Clause jurisprudence and, as such, informs our discussion.

1.    Purpose

To satisfy the "purpose" prong of the <u>Lemon</u> test, Plattsmouth must articulate a secular purpose for erecting and maintaining its Ten Commandments monument. <u>Edwards v. Aguillard</u>, 482 U.S. 578, 585 (1987); <u>Books</u>, 235 F.3d at 303 n.8. Plattsmouth's purpose need not be exclusively secular; <u>Lemon</u> requires only "*a* secular purpose." <u>Lynch</u>, 465 U.S. at 681 n.6 (emphasis added). Nor does <u>Lemon</u>'s secular-purpose prong require the purpose "be unrelated to religion – that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted. Rather, <u>Lemon</u>'s 'purpose' requirement aims at preventing the relevant governmental decisionmaker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." <u>Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos</u>, 483 U.S. 327, 335 (1987) (quotations and citations omitted). While we accord some deference to Plattsmouth's avowed purpose, it is our role to "distinguis[h] a sham secular purpose from a sincere one." <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 308 (2000); <u>see also</u> <u>Edwards</u>, 482 U.S. at 586-87 ("While the Court is normally deferential to a State's articulation of a purpose, it is required that the statement of such purpose be sincere and not a sham."); <u>see, e.g.</u>, <u>Adland</u>, 307 F.3d at 484 (rejecting state's avowed purpose of "remind[ing] Kentuckians of the Biblical foundations of the laws of the Commonwealth" and finding real purpose was religious).

This matter has come to us as an appeal from the decision on summary judgment. We review a grant of summary judgment de novo, applying the same standard as the district court. Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Summary judgment is proper if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The parties agree on the facts; our role is to review the district court's application of the undisputed facts to the purpose inquiry. The district court declined to rule whether the purpose prong was satisfied, relying instead on the effects analysis. The undisputed facts from which we draw our conclusions, however, are in the record.

We look first to Plattsmouth's purpose in 1965 in accepting the monument and having it installed on public property. Plattsmouth argues there is no evidence of a religious purpose because no records of the decision-making process survive. While such records can be useful in discerning government purpose, see, e.g., Books, 235 F.3d at 303, they are not the only available evidence. In this case, undisputed evidence of Plattsmouth's purpose in accepting, erecting and maintaining the monument is to be found in the content and context of the monument itself. Id. at 302 (looking at "the totality of the circumstances" surrounding placement and maintenance of an Eagles monument to determine city's purpose).[9]

---

[9]The dissent is of the view the undisputed history, content and context of the monument are an inadequate foundation upon which to build the purpose prong analysis, and cites Lynch for support. We do not believe Lynch requires an explicit statement of an exclusively improper legislative purpose to run afoul of the purpose prong analysis. We have taken to heart, and do herein apply, Lynch's lesson that narrow and exclusive focus on the religious display is insufficient to find improper purpose. We take a comprehensive view of the monument, its history and its physical context to draw our conclusions.

We begin with the words and symbols on the monument. The monument's message is undeniably religious. Stone v. Graham, 449 U.S. 39, 41 (1980) ("The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact."); see also Elkhart v. Books, 532 U.S. 1058, 1058 (2001) (Stevens, J., opinion respecting denial of certiorari) (noting the phrase "I AM the LORD thy GOD . . . is rather hard to square with the proposition that the monument expresses no particular religious preference – particularly when considered in conjunction with . . . [the fact] that the monument also depicts two Stars of David and a symbol composed of the Greek letters Chi and Rho superimposed on each other that represent Christ."). The monument declares the existence and supremacy of God, and prescribes a code of behavior. Some of the rules of behavior are exclusively religious. See O'Bannon, 259 F.3d at 770-71 ("[T]he Ten Commandments . . . commands the reader to worship only the Lord God, to avoid idolatry, to not use the Lord's name in vain, and to observe the Sabbath. These particular commandments are wholly religious in nature, and serve no conceivable secular function."). Although several of the Commandments have secular applications (not stealing comes to mind) the monument presents even these rules with a religious tenor because their putative source is "the LORD thy God," not the City of Plattsmouth or the courts or another secular source. It is one thing for Plattsmouth to say one should not steal; it is quite another for Plattsmouth to say there is a God who said, "Thou shalt not steal."

Nothing in the monument's surrounds suggests its religious message might not be its raison d'etre. Plaques and nameplates in remembrance of, or in thanks to, various individuals adorn other park items as well as a wall by the main entrance to the park. Unlike the monument, however, these messages of thanks and recognition do not appear on well-known religious symbols nor are they accompanied by any religious text. We also note the monument shares its environs with trees and recreational equipment provided by Plattsmouth for purely secular purposes. But none of this mise-en-scène reflects an intent to merely complement an otherwise

secular setting by drawing on one of the Ten Commandments' secular applications. See, e.g., Edwards, 482 U.S. at 594 (noting the decision in Stone "forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization."). Rather, the monument's religious purpose stands naked in the middle of the park with no evident purpose but to endorse and advance its religious message. Indeed, Plattsmouth concedes it "does not assert that it displays the monument in order to show the secular role and influence of the Ten Commandments . . . ." Appellant's Brief at 6. (emphasis in original).

In response to this litigation, Plattsmouth's City Administrator, who has no first-hand knowledge of the acceptance or installation of the monument, submitted testimony declaring "it is safe to assume" the purpose of installing the monument was to show gratitude to the Eagles for their civic contributions. The district court discredited and discounted this proposed secular purpose. We also think the secular purpose the Administrator invites us to assume runs counter to the undisputed evidence. While there is undisputed evidence the Plattsmouth Eagles is a venerated organization whose good works makes it worthy of gratitude and public honor, the monument does not mention its contributions. The monument was a gift *from* the Eagles *to* the City of Plattsmouth and on a small scroll at the bottom of the monument the Eagles properly take credit for the gift. But the Eagles and its civic contributions are not the subject or object of the monument. Rather, donation of the monument *was* one of the Eagles's many well-intended contributions to Plattsmouth. But see, Van Orden, 351 F.3d at 178-79 (affirming the purpose in accepting an Eagles monument was "to recognize and commend a private organization for its efforts to reduce juvenile delinquency.").

Plattsmouth's motivation is at issue here, not the Eagles's, and it is particularly difficult to reconcile Plattsmouth's purported purpose of thanking the Eagles with the

-23-

undisputed history of the Eagles Ten Commandments project. See Books, 235 F.3d at 303 (considering, inter alia, the history of the Eagles Ten Commandments project in concluding the City of Elkhart's real purpose was not secular); Mercier v. LaCross, 276 F.Supp.2d 961, 973-74 (W.D. Wis. 2003) (noting donation of an Eagles monument was part of the nation-wide program and concluding that fact disproved city's avowed secular purpose of thanking volunteers who helped after a flood). The Eagles donated this monument as a part of its nationwide campaign to spread its version of the Ten Commandments; Plattsmouth's purpose in erecting it was nothing more complex than the adoption of that goal. Plattsmouth may well have been concerned that refusing the monument would offend the Eagles, but that is hardly a valid secular purpose for departing from the strictures of the Establishment Clause.

Plattsmouth's avowed secular purpose for this Ten Commandments monument calls to mind the Stone case, in which the Supreme Court struck down a state law requiring the posting of the Ten Commandments in public schools on the ground that the statute had no secular purpose. 449 U.S. at 41. The state in Stone insisted the postings served a secular legislative purpose because they included a statement saying the Ten Commandments had been adopted "as the fundamental legal code of Western Civilization and the Common Law of the United States." Id. at 41. The Supreme Court rejected the school district's avowed secular purpose as self-serving and looked to the undeniably religious nature of the postings to conclude the state's purpose in enacting the law was an impermissibly religious one. Id. at 42-43. See also Santa Fe Indep. Sch. Dist., 530 U.S. at 308 ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to distinguis[h] a sham secular purpose from a sincere one.") (internal quotation omitted); Wallace v. Jaffree, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring) ("I have little doubt that our courts are capable of distinguishing a sham secular purpose from a sincere one, or that the Lemon inquiry into the effect of an enactment would help decide those close cases where the validity of an expressed secular purpose is

in doubt."); <u>Sch. Dist. of Abington</u>, 374 U.S. at 223 (holding unconstitutional daily reading of Bible verses and the Lord's Prayer in the public schools, despite the school district's assertion of such secular purposes as "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature."). The <u>Stone</u>, <u>Santa Fe</u> and <u>Abington</u> cases stand for the proposition the courts need not take at face value an Establishment Clause defendant's avowed secular purpose.

In this case, there is clear evidence Plattsmouth's purpose was religious, and only a self-serving statement, by someone without first-hand knowledge, of a secular purpose. Accordingly, we conclude Plattsmouth's purpose in installing the monument was solely religious. Indeed, Plattsmouth's monument is the paradigmatic violation of the Establishment Clause: government speech declaring religious truth. Andrew Koppleman, <u>Secular Purpose</u>, 88 Va. L. Rev. 87, 108-09 (2002) ("The Establishment Clause forbids the state from declaring religious truth . . . . It means that the state may not declare articles of faith. The state may not express an opinion about religious matters. It may not encourage citizens to hold certain religious beliefs."). In sum, the monument, its context and its history disprove the purpose Plattsmouth asks us to assume based on the speculation of its City Administrator. We therefore hold the district court did not err when it labeled Plattsmouth's proposed secular purpose for originally installing the monument as a "guess . . . far too speculative" to credit.

We do not, as Plattsmouth suggests, adopt a rule of presumptive invalid religious purpose for all religious displays on public property. Our holding is not nearly so broad. There are secular purposes for displaying the Ten Commandments, just as there are for other religious teachings. <u>See</u> Gregory M. Bartlett, <u>Displaying the Ten Commandments on Public Property: The Kentucky Experience: Wasn't it Written in Stone?</u>, 30 N. Ky. L. Rev. 163, 183 (2003) ("[T]here is no doubt that the state can display the Ten Commandments, if it does so with a secular purpose and in

a proper context. *The question remains whether the advocates of displaying the Commandments are truly willing to limit the use of this sacred text for secular purposes*.”) (emphasis added); see also Edwards, 482 U.S. at 594; Stone, 449 U.S. at 42; Sch. Dist. of Abington, 374 U.S. at 225, 300, 306; McCollum v. Bd. of Educ., 333 U.S. 203, 236 (1948) (Jackson, J., concurring) (“One can hardly respect a system of education that would leave the student wholly ignorant of the currents of religious thought.”); Books, 235 F.3d at 302 (“The display of a religious symbol still may, under certain circumstances, have a secular purpose.”). Just because there are permissible secular purposes for displaying the Ten Commandments, however, does not mean there is always a secular purpose for such a display. In this case, the evidence shows Plattsmouth was “motivated wholly by religious considerations.” Lynch, 465 U.S. at 680. Plattsmouth abandoned its duty to religious neutrality and acted with the intent of promoting a particular point of view in religious matters. Amos, 483 U.S. at 335. By expressing a religious truth, Plattsmouth began establishing religion in 1965 when it installed its monument.

Notwithstanding its improper purpose in installing the monument in 1965, Plattsmouth argues it should prevail if it can show a secular purpose in retaining the monument. The recent Third Circuit decision in Freethought Soc’y, lends some support to this argument. 334 F.3d at 261-62 (citing Books, 235 F.3d at 302). In Freethought Soc’y, a county refused to remove a brass Ten Commandments plaque that had been affixed to a courthouse wall some eighty years earlier. The court looked to the county’s purpose in retaining the plaque in 2001 to satisfy the purpose prong of the Lemon analysis without regard to whether the purpose of installing it eighty years before was secular. We need not, however, decide this question because Plattsmouth does not currently have a secular purpose for retaining the monument. The avowed purpose that comes closest – the cost of removal – is discredited by the undisputed facts. Unlike the Freethought Soc’y case, the government here has acted to maintain the monument. While this action was being litigated below, the monument was toppled over and Plattsmouth reinstalled it the very next day.

Evidently, the monument is none too difficult to remove from its setting. Plattsmouth used City resources to reinstall the monument, so it may not now complain about the expense to demur from removing or secularizing it.

The purported artistic and historic purposes fare no better. Unlike the plaque in Freethough Soc'y, Plattsmouth's monument is thirty-five years old, which does not a historical artifact make. Nor is this monument affixed to a historical building; rather, it sits alone in a park without a secularizing context. With all due respect to the monument's craftsperson, the Ten Commandments and symbols are the subject of the monument; any artistic value in their presentation is not Plattsmouth's real purpose for refusing to remove or secularize it. Plattsmouth's avowed purposes for retaining the monument appear to be but a pretext for keeping the monument on public land without a secularizing context. Plattsmouth's purpose is the same as it was in 1965 – impermissible endorsement and advancement of its chosen religious truth.

By having a solely religious purpose for installing or maintaining the monument, Plattsmouth has failed the first prong of Lemon, and we need proceed no further. Stone, 449 U.S. at 42-43; Santa Fe Indep. Sch. Dist., 530 U.S. at 308; Sch. Dist. of Abington, 374 U.S. at 223. To be thorough, however, we round out our analysis with the second Lemon prong. The third prong – entanglement – is not at issue so we shall not address it.

2.      Effect

The second prong of the Lemon test requires that the "primary effect" of the challenged government action neither advance nor inhibit religion. Children's Healthcare, 212 F.3d at 1095. Thus, the primary effect of Plattsmouth's monument is "what viewers may fairly understand to be [its] purpose . . . ", Lynch, 465 U.S. at 692, irrespective of the government's actual purpose. 465 U.S. at 690 (O'Connor,

J., concurring). In other words, where the purpose prong looked to the government's actual purpose, this prong asks what the government is perceived to intend by the display. Government action will fail the effects prong if it "is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices." County of Allegheny, 492 U.S. at 573.[10] See also Lynch, 465 U.S. at 688 (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.").

The reasonable observer whose perspective we must adopt when deciding the effect of the monument is more informed about the monument and its history than are uninformed passers-by. Books, 235 F.3d at 306 ("In assessing the situation before us, we must ask whether an objective observer familiar with the history and placement of the Ten Commandments monument would perceive it as a state endorsement of religion."); see also Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 779-781 (1995) (O'Connor, J., concurring); Freethought Soc'y, 334 F.3d at 259. Therefore, we look to the perspective of a reasonable observer aware of the monument's history, including the Eagles's national project that landed it in Memorial Park and the many civic contributions of the Plattsmouth Eagles. Our reasonable observer would know City employees erected it in 1965 and re-erected it in 2001. This observer would be able to recognize the symbols on the monument and be aware the Ten Commandments are a sacred text found in the Judeo-Christian and Islamic religions. This is a well informed observer indeed, because he or she knows that, while Plattsmouth has accepted and erected other donated items in the park, none of those items bears a religious text or conveys any religious message. Finally,

---

[10] Some Circuits consider Allegheny to have created a whole new "endorsement" test separate from (and replacing) Lemon, see, e.g., Freethought Soc'y, 334 F.3d at 247, 263, but in this Circuit we look at the endorsement question as part of Lemon's effects prong. Children's Healthcare, 212 F.3d at 1095.

our reasonable observer would be aware of Plattsmouth's proffered reason for erecting the monument – offered some thirty-five years after the fact – and would know he or she is not required to accept the City's explanation.

The context of a government religious display may be determinative of its effect. County of Allegheny, 492 U.S. at 597 ("[T]he effect of the government's use of religious symbolism depends on its context."). Some displays which have passed Establishment Clause scrutiny differ only in their context from displays which have failed. In County of Allegheny, for example, the Supreme Court held a Nativity scene inside a county courthouse violated the Establishment Clause because its context – a few poinsettias and a plaque naming the scene's donor – did nothing to detract from the display's religious message. Id. at 599-600. The Nativity scene stood alone as the single element of display in a prominent spot in the building. Id. at 598. In contrast, a menorah simultaneously displayed elsewhere as part of a display with a large Christmas tree and sign reading "Salute to Liberty," was not a violation of the Establishment Clause because the context "secularized" the menorah. Id. at 620-21. Another illustrative comparison is between the Supreme Court's treatment of the Nativity scene in Allegheny, which had not been secularized by its context, and a Nativity scene in Lynch. In Lynch the Nativity scene was secularized by being displayed as part of a large holiday display, including Santa Clause, candy-striped poles, clown and bear. 465 U.S. at 671. Therefore, we weigh heavily the context of Plattsmouth's monument in determining its effect on the reasonable viewer.

The context of the monument does nothing to secularize it. To any reasonable viewer it would be clear the park and monument are public property and Plattsmouth could remove, alter, or add to it at will. The monument's religiosity stands in sharp contrast to, and therefore is amplified by, the recreational uses of the space. Nothing about the park setting secularizes the pronounced religiosity of the monument. See Books, 235 F.3d at 306 ("[T]he [Eagles] monument cannot fairly be characterized as a component of a comprehensive display of the cultural heritage of the people of

Elkhart" because the only other item on the lawn was a war memorial); Adland, 307 F.3d at 483-84, 88-89 (holding an assortment of commemorative signs, plaques, tree markers and war memorial lacked a common theme to secularize an Eagles Ten Commandments monument).

Plattsmouth rightly points out there are material differences between the location of its display and those displays found unconstitutional in County of Allegheny and Books. The Supreme Court in County of Allegheny and the Seventh Circuit in Books said the fact that the displays were located near the heart of government made it more likely that a reasonable observer would perceive them to be an endorsement of religion. County of Allegheny, 492 U.S. at 599; Books, 235 F.3d at 306. Plattsmouth's monument is not located at or near any government building. While this fact lessens the perceived association between the government and monument, it doesn't do so by much. The monument's inscription links government to its religious message to a degree its location may not. Specifically, the inclusion of the patriotic symbol of an eagle gripping a flag on the monument impermissibly links patriotism and government to the religious teaching on the monument. See Books, 235 F.3d at 307. Moreover, its location is hardly detached from the government; the monument is on public land. The government's adoption of its religious message is apparent to the reasonable observer whether the monument is near City Hall or not. Therefore, the different setting between County of Allegheny and Books are not sufficiently distinguishing to lead us to a different conclusion.

The monument's endorsement of multiple Judeo-Christian faiths, instead of one particular sect, is no less of an establishment than endorsement of one alone. See County of Allegheny, 492 U.S. at 615 ("The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone."). The First Amendment protects not only Christians and Jews, but atheists, animists, pagans, wicca and everyone alike, no matter whether they are inside or outside the religious mainstream. County of Allegheny, 492 U.S. at 615 (The

Establishment Clause "guarantee[s] religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.") (internal quotation omitted); Wallace, 472 U.S. at 52-53 ("[T]he Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all."). We are all of us on a search for truth, and the Establishment Clause prohibits the government from purposefully steering us in a particular direction. See generally William P. Marshall, In Defense of the Search for Truth as a First Amendment Justification, 30 Ga. L. Rev. 1, 10-16, 38-39 (1995) (discussing the founders' views on the search for truth as a rationale for the religion clauses and the prohibition of official orthodoxy); cf. Lee v. Weisman, 505 U.S. 577, 607 (1992) ("When the government appropriates religious truth, it 'transforms rational debate into theological decree.' . . . [T]hose who disagree no longer are questioning the policy judgment of the elected but the rules of a higher authority who is beyond reproach.") (internal citation omitted). The reasonable viewer would perceive this monument as an attempt by Plattsmouth to steer its citizens in the direction of mainstream Judeo-Christian religion. This it cannot do.

3.      Historical Precedents

We have now held Plattsmouth's Ten Commandments monument fails both the purpose and effect prongs of the Lemon test, and therefore violates the Establishment Clause of the First Amendment. Plattsmouth argues the monument is constitutional nonetheless under the Marsh v. Chambers historical precedents test no matter the outcome of our Lemon analysis. 463 U.S. 783 (1983). In Marsh, the Supreme Court did not apply the Lemon test (or Larson for that matter), and upheld Nebraska's practice of opening state legislative sessions with a prayer by a state-funded chaplain because the practice was "deeply embedded in the history and tradition of this country." Id. at 795. In Marsh, the Court concluded the practice was "deeply

-31-

embedded" because legislative sessions had been preceded by such prayers since colonial times.  <u>Id.</u> at 786.[11]

In this case, however, there is no unambiguous and unbroken two-hundred-year history of displaying Ten Commandments monuments in public parks.  Plattsmouth argues its monument is merely an acknowledgment of God, and general acknowledgments of God are deeply embedded in our history.  Without addressing the second part of this argument, we find fatal fault in Plattsmouth's characterization of the monument as merely an acknowledgment of God.  The monument does much more than acknowledge God; it is an instruction from the Judeo-Christian God on how He requires His followers to live.  To say a monument inscribed with the Ten Commandments and various religious and patriotic symbols is nothing more than an "acknowledgment of God" diminishes their sanctity to believers and belies the words themselves.  We conclude Plattsmouth's Ten Commandments monument is not saved by the historical precedents test.

Accordingly, the judgment of the district court is affirmed.

RICHARD S. ARNOLD,  Circuit Judge, concurring in part and concurring in the judgment.

I join and applaud most of the Court's excellent opinion, including all of part I. and that portion of part II. dealing with the <u>Lemon</u> "test."

I would like to say, in addition, that I believe this monument is also invalid under the <u>Larson</u> test.  The words on the monument clearly prefer Christianity and

---

[11]The Court has since noted, "<u>Marsh</u> plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today."  <u>County of Allegheny</u>, 492 U.S. at 603-04.

Judaism. As the Court very properly remarks in words that I think should be heard everywhere:

> The monument does much more than acknowledge God; it is an instruction from the Judeo-Christian God on how he requires his followers to live. To say a monument inscribed with the Ten Commandments and various religious and patriotic symbols is nothing more than an "acknowledgment of God" diminishes their sanctity to believers and belies the words themselves.

Ante, at 27.

I concur without reservation in the result, affirmance of the judgment of the District Court.

BOWMAN, Circuit Judge, partially concurring and dissenting.

I agree with the Court's decision that Doe and the ACLU Foundation of Nebraska have standing to bring this suit. I also agree that this case cannot be decided under Larson v. Valente's strict-scrutiny test. 456 U.S. 228, 246 (1982). I cannot, however, agree with the Court's conclusion that the evidence of Plattsmouth's religious purpose is so unmistakably "clear" and "undisputed" as to warrant the conclusion that the first part of the Lemon test has been violated. Ante at 25, 21. Nor do I agree that the monument violates the second part of the Lemon test. Instead, because I cannot conclude that the primary effect of the placement of the Eagles' monument in an inconspicuous spot in a city park is to advance or to "endorse" religion, I would reverse the decision of the District Court.

I.

A.

The opinion of the Court holds that the monument's presence violates the Establishment Clause because the city had a religious purpose when it erected the monument. Lemon v. Kurtzman, 403 U.S. 602, 612 (1971) (requiring "a secular . . . purpose" for state action). I disagree with this conclusion for several reasons. Because it forces this conclusion, the Court goes beyond what the facts suggest, what the District Court found, and what Supreme Court precedent permits. Specifically, in order to find religious purpose for the city's actions where none exists, the Court uses a form of reasoning that the Supreme Court has previously disavowed. Moreover, the Court's finding of a religious purpose essentially means that the District Court's findings of fact on this issue were clearly erroneous; yet nowhere does the opinion state that conclusion. In truth, there is no factual basis for concluding that the city had a religious purpose when it permitted the monument to be erected.

There is very little evidence regarding the monument's origins and the purpose of those who erected it. The District Court's findings of fact reflect the paucity of this evidence. Specifically, the District Court found that "[t]hen-Street Commissioner Art Hellwig and other city employees helped erect the monument. Hellwig was at the time an officer of the Eagles, and it is not known whether he helped erect the monument in his capacity as Street Commissioner or as an Eagles officer." Mem. & Order at 4 (Feb. 19, 2002) (citation omitted). Later, the District Court concluded that "there is no record of the City's intent when it accepted the donation of the monument in 1966." Id. at 15. The District Court acknowledged that the only direct evidence of the city's purpose was the "guess" of the current City Administrator, who stated that it was "safe to assume that the Eagles' monument . . . was accepted by the city and placed in Memorial Park out of gratitude to the Eagles for their civic work." Id.

at 16 (quoting Winkler affidavit). But the District Court discounted this reason because "[t]he fact of the matter is that no one knows why the City accepted the monument." Id. at 16 n.10. Ultimately, the District Court was unwilling "to speculate" and attempt to attribute a motive to the city. Id. Consequently, the court avoided the secular versus religious purpose question and concluded that, in any event, the effects part of the Lemon test was violated. I disagree with the Court's finding of a religious purpose where the District Court concluded there was inadequate evidence.[12]

Given the facts as the District Court found them and given the dearth of evidence related to Plattsmouth's intent, there is no reason to perceive a religious purpose where the District Court observed that "no one knows why the City accepted the monument." Id. at 16. The Court goes too far when it concludes that "there is clear evidence Plattsmouth's purpose was religious" and that the city's avowed secular purpose was "only a self-serving statement, by someone without first-hand knowledge." Ante at 25. Even more strongly, the Court states that:

> the evidence shows Plattsmouth was "motivated wholly by religious considerations." Plattsmouth abandoned its duty to religious neutrality and acted with the intent of promoting a particular point of view in religious matters. By expressing a religious truth, Plattsmouth began establishing religion in 1965 when it installed its monument.

Id. at 26 (citations omitted); see also id. at 25 ("[W]e conclude Plattsmouth's purpose in installing the monument was solely religious. Indeed, Plattsmouth's monument is the paradigmatic violation of the Establishment Clause . . . ."). Typically, where

---

[12]Whether the final conclusion about the city's religious or secular purpose is a purely legal or factual question, or is a mixed question of law and fact, does not matter because in this case it is clear that the Court has undertaken to make its own findings of fact on this issue.

courts have found such a clear religious purpose behind a government's display of the Ten Commandments, the evidence of religious purpose has been explicit. See, e.g., Glassroth v. Moore, 335 F.3d 1282, 1296–97 (11th Cir.), cert. denied, 124 S. Ct. 497 (2003). In the absence of clear evidence to the contrary, the city's stated reason should stand. See Lynch v. Donnelly, 465 U.S. 668, 680 (1984).

Even though there is no evidence to support the conclusion that Plattsmouth had a religious purpose in erecting the monument, the Court finds one by reasoning that because the Eagles had a religious purpose, the city must have adopted that religious purpose. Ante at 24 ("The Eagles donated this monument as a part of its nationwide campaign to spread its version of the Ten Commandments; Plattsmouth's purpose in erecting it was nothing more complex than the adoption of that goal."). More precisely, the Court finds "undisputed evidence of Plattsmouth's purpose in accepting, erecting and maintaining the monument . . . *in the content and context of the monument itself*." Id. at 21 (emphasis added). I cannot agree that this method of deduction is allowable under Supreme Court precedent or that the Court has reached a reasonable conclusion.

First, and most importantly, the Court's reasoning is erroneous under Lynch. The majority acknowledges Lynch by quoting it when explaining that "the evidence shows Plattsmouth was 'motivated wholly by religious considerations,'" ante at 26 (quoting Lynch, 465 U.S. at 680); yet the Court ignores the substantive law of that case. In Lynch, the Supreme Court first observed that "[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." 465 U.S. at 680. Next, the Court noted that it had in the past "invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations." Id. Finally, the Lynch Court explained the lower court's error: "The District Court inferred from the religious nature of the crèche that the city has no secular purpose for the display. In

-36-

so doing, it rejected the city's claim that its reasons for including the crèche are essentially the same as its reasons for sponsoring the display as a whole. The District Court plainly erred by focusing almost exclusively on the crèche." Id. I must conclude that this Court, by ignoring existing Supreme Court precedent, has erred by finding religious purpose in the manner in which it has.

Second, wholly apart from the problem just flagged, there is no reason to conclude that the city adopted whatever purpose the Eagles had when they made the donation. Rather, the history and context of this case show only that the city accepted the monument on the same terms as it did any of the other donated items that have been placed in the city's parks. Governmental entities generally do not adopt the messages contained on the various monuments they permit to be erected on government land. In Van Orden v. Perry, which considered an Eagles monument situated on the grounds of the Texas State Capitol, the Fifth Circuit expressly rejected the plaintiff's attempt to prove a religious purpose for the Eagles' actions and then to attribute that purpose to the State of Texas. 351 F.3d 173, 179–80 (5th Cir. 2003). That court rejected this method of proving religious purpose because nothing in the legislative history, in the events surrounding the monument's donation, or in the state's practice of accepting and erecting monuments "suggested that the recited reason was a sham." Id. at 179. In the case at hand, the only evidence of the city's purpose is the statement by the City Administrator indicating a secular purpose as well as the fact that the city accepted the monument on the same terms as it did other structures and monuments that have been donated. In these circumstances, the city's stated reason should stand and the inquiry should proceed to the second part of the Lemon test. In any event, to ascribe what the Court believes might have been the Eagles' purpose to the city conflicts with Lynch v. Donnelly.[13]

_____

[13]Even if the Eagles' purpose is attributed to the city, there are grounds on which to conclude that their purpose was not religious. In Colorado v. Freedom from Religion Foundation, another Eagles monument case, the Colorado Supreme Court arrived at exactly that conclusion. 898 P.2d 1013, 1024 (Colo. 1995), cert. denied,

Third, I cannot agree that merely looking to the text or to the "content and context of the monument itself" can provide the "clear evidence" of religious purpose that the Court finds. Ante at 21, 25. As a general matter, the content and context of the monument are more usefully considered under the "endorsement" inquiry or under the second part of the Lemon test and should not be the *sole* basis for ascribing a religious purpose to a governmental entity where the record is largely devoid of such evidence. See Lynch, 465 U.S. at 680.

In any event, I cannot agree that, in and of itself, the content of the monument establishes a religious purpose that is attributable to the city. The contents of the monument are arranged in a way that places the Ten Commandments within the Judeo-Christian tradition, a tradition that undergirds the history of the western world and of America. First there is the Semitic script, which is clearly Hebrew in origin, depicted at the top of the monument. With the Semitic script are joined two Stars of David placed near the bottom of the monument. The clearly Christian item is the Chi Rho symbol, commonly regarded as the sign of Christ. Within the boundaries marked by these religious symbols is a non-denominational rendering of the Ten Commandments. On top of the text are two non-religious symbols representing America, the all-seeing eye (part of the Great Seal adopted by the Continental Congress) and an eagle holding an American flag. The non-religious symbols representing America and its founding then link the text to our nation's history, where the code of conduct embodied in the commandments has played an important role.

---

516 U.S. 1111 (1996) (noting that the stated goal of the Eagles' National Youth Guidance Project was not religious; that the juvenile court judge who came up with the idea "stat[ed] that posting the Ten Commandments was 'not to be a religious instruction of any kind,' but rather was meant to 'show these youngsters that there were such recognized codes of behavior to guide and help them'"; and that this explanation was consistent with what little evidence of purpose existed). See also Van Orden, 351 F.3d at 179–80 (strongly suggesting that the Eagles' program to combat juvenile delinquency was not religious in purpose).

See, e.g., County of Allegheny v. ACLU, 492 U.S. 573, 652–53 (1989) (Stevens, J., concurring in part, dissenting in part, and discussing Moses as great law giver); Stone v. Graham, 449 U.S. 38, 42 (1980) (noting that the Ten Commandments and the "Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like"); see also Edwards v. Aguillard, 482 U.S. 578, 593–94 (1987) (observing that Stone "did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization"); Lynch, 465 U.S. at 677 (noting governmental acknowledgments of religious heritage in legal tradition); Lynch, 465 U.S. at 691 (O'Connor, J., concurring and noting that the State in Stone "plainly had some secular objectives, such as instilling most of the values of the Ten Commandments and illustrating their connection to our legal system"). In this presentation, the display illustrates the importance of the rule of law and the long tradition of legal codes of conduct in our own history and in the history of the western world. Although it is impossible to know whether the juveniles at whom this monument was aimed grasped the sophisticated imagery on the thousands of Eagles monuments, the monument itself tends to corroborate the Eagles' stated purpose for undertaking the program. Therefore, I disagree with the Court's conclusion that the monument itself proves that Plattsmouth had a religious purpose. Moreover, "by focusing almost exclusively on" the monument itself, the Court makes the same error that the Supreme Court described in Lynch. 465 U.S. at 680. The Court should have concluded that the city's purpose was either secular or, as the District Court concluded, impossible to discern on the record made in this case. The analysis must then proceed to the second part of the Lemon test.

B.

I cannot agree with the Court's finding that Plattsmouth had a religious purpose for two other reasons. First, although the Court states that it does not "adopt a rule

of presumptive invalid religious purpose for all religious displays on public property," Ante at 25, it is difficult to imagine any Ten Commandments display that could pass muster. In fact the Court makes it clear that it would find an Establishment Clause violation no matter where the city displayed this gift. Id. at 30 ("The government's adoption of [the monument's] religious message is apparent to the reasonable observer whether the monument is near City Hall or not."). With the actions of former Chief Justice Moore in Glassroth on one end of the spectrum, and the City of Plattsmouth on the other end of the spectrum, the Court has left little room for displays that will not run afoul of the Establishment Clause. It is hard to see, for instance, how the Ten Commandments plaque affixed to the side of the Chester County courthouse in Freethought Society v. Chester County, 334 F.3d 247, 251 (3d Cir. 2003), could pass muster under this Court's opinion. While the Court notes the existence of that case, it makes little effort to distinguish it beyond noting that the plaque was present longer (some eighty years total) than this monument and that, in this case, Plattsmouth has done more to maintain the monument and to celebrate its presence because the city returned the monument to its upright position after it had been toppled over. See Ante at 26; see also Freethought Soc'y, 334 F.3d at 251.

I part ways with the District Court and this Court's opinion in one final respect. I cannot agree with their reliance on those "Ten Commandment" cases in which evidence of religious purpose was explicit. Thus, I disagree with the District Court's conclusion that "*Books* [v. City of Elkhart] is the next best thinking on the subject," absent "specific guidance from the Supreme Court" or from the Eighth Circuit. Mem. & Order at 2. In Books, the evidence regarding religious purpose was explicit, for the monument was dedicated in a ceremony featuring, literally, a priest, a rabbi, and a minister, some of whom invoked religion when speaking of the monument and of its purpose. See Books v. City of Elkhart, Ind., 235 F.3d 292, 303 (7th Cir. 2000), cert. denied, 532 U.S. 1058 (2001). So too in Adland v. Russ, 307 F.3d 471, 482 (6th Cir. 2002), cert. denied, 123 S.Ct. 1909 (2003), where the state law implementing Kentucky's plan to remove an Eagles monument from storage and display it on the

-40-

grounds of the state capitol listed (arguably) overtly religious reasons for erecting the monument. Finally, in Glassroth, the evidence of former Chief Justice Moore's religious purpose was explicitly clear. The clarity of the evidence in these cases belies the Court's conclusion that there was clear evidence of Plattsmouth's religious purpose.

Rather than rely on cases that are factually far removed to guide our decision, I would turn to Van Orden and Freethought Society. These cases provide a better structure within which to evaluate the plaintiffs' claims. As already noted, in Van Orden, like the present case, there was little direct evidence of purpose and the Fifth Circuit rejected the plaintiff's attempt to prove purpose by association. Similarly, in Freethought Society, the evidence of purpose at the time the plaque was put in place was eighty years old and far removed from the city's present reason for keeping the monument. Given the lack of evidence of a religious purpose, both courts proceeded to the second part of the Lemon test and, at the end of the day, found no violation of the Establishment Clause. I would do the same here.

II.

The opinion of the Court also holds that the second part of the Lemon test is violated by this monument's presence in Memorial Park. Whether this inquiry is styled as the second element of the Lemon test (i.e., whether the "principal or primary effect [of the government action] advances [or] inhibits religion," 403 U.S. at 612), or as a test that looks for government "endorsement" of religion, it has never been the case that the mere presence of a religious display or monument on government land has, *ipso facto*, commanded the conclusion that the Establishment Clause was violated. Rather, the Supreme Court's Establishment Clause cases suggest that something more is required for a court to determine that the display's "principal or primary effect" is to advance religion or for a court to determine that a "reasonable observer would view [the] government practice as endorsing religion," Capitol Square

-41-

Review & Advisory Bd. v. Pinette, 515 U.S. 753, 777 (1995) (O'Connor, J., concurring).   I would reverse the decision of the District Court because I cannot conclude that the monument's primary effect is to advance or to endorse religion.

The Ten Commandments have both a secular and a religious message.  Crucial to the question of whether the Establishment Clause is offended by a display such as this is the context of the display and the facts related to its history.  Because the principal or primary effect of the monument is not to advance religion to any greater extent than the Supreme Court has already permitted, the "effects" part of the Lemon test is not violated.  See Lynch, 465 U.S. at 682 ("We are unable to discern a greater aid to religion deriving from inclusion of the crèche than from these benefits and endorsements previously held not violative of the Establishment Clause.").  Religion receives little, if any, benefit from the presence of the monument in Memorial Park.  Any benefit that does tend to flow to religion cannot reasonably be said to be greater than the benefit religion received as a result of the Sunday closing laws approved of in McGowan v. Maryland, 366 U.S. 420 (1961), the supplying of textbooks to religious schools approved of in Board of Education v. Allen, 392 U.S. 236 (1968), the tax exemptions for religious institutions approved of in Walz v. Tax Commissioner of New York, 397 U.S. 664 (1970), the tax deductions for tuition expenses at religious institutions approved of in Mueller v. Allen, 463 U.S. 388 (1983), the legislative prayers approved of in Marsh v. Chambers, 463 U.S. 783 (1983), the display of a crèche approved of in Lynch, 465 U.S. 668, the display of a menorah and Christmas tree approved of in County of Allegheny v. ACLU, 492 U.S. 573, or the student vouchers approved of in Zelman v. Simmons-Harris, 536 U.S. 639 (2002).[14]

The meatier question in this case—where so little "benefit" passes to religion—is the endorsement question.  That is, would the reasonable person, who is

_____

[14]This list of examples is not intended to be all-inclusive.

aware of the history and context of this case, perceive that the City of Plattsmouth endorses religion, or any particular brand of religion, because it has permitted this monument to be erected in a corner of a city park? <u>Pinette</u>, 515 U.S. at 780 (O'Connor, J., concurring) (cited in <u>Zelman</u>, 536 U.S. at 655, and quoted in <u>Good News Club v. Milford Central School</u>, 533 U.S. 98, 119 (2001)). I cannot conclude that the reasonable observer would perceive such endorsement.

In this case, the reasonable observer knows that the Eagles donated this monument in 1965 and that the city permitted the monument to be erected in 1966.[15] Although the reasonable observer knows that Art Hellwig and certain other individuals, who were also city employees, helped to erect the monument, the reasonable observer does not know in what capacity these individuals were acting. The reasonable observer, therefore, is quite aware that these individuals may have been acting in their individual capacities. The reasonable observer also knows that the city, when asked why it accepted the monument and permitted it to be erected, stated that it had no contemporaneous records regarding that decision but surmised from its practice of accepting donations and from the fact that the Eagles are an important civic organization that it was "safe to assume that the Eagles' monument . . . was accepted by the city and placed in Memorial Park out of gratitude to the Eagles for their civic work." Mem. & Order. at 16 (quoting Winkler affidavit). Further, our observer knows that the monument was placed in a corner of Memorial Park, that from the street the monument looks rather like a tombstone, and that the text of the Ten Commandments is not visible unless one enters the park and makes a special effort to approach the monument. The reasonable observer is also aware that Plattsmouth has accepted many other donated structures, plus donated recreation equipment and donated trees, and also knows that plaques are often affixed to these items to note or to commemorate the donations. More specifically, the reasonable

---

[15]The reasonable observer knows the monument was donated because it says so just beneath the symbols at the bottom of the text of the Ten Commandments.

observer knows that private groups, such as the Lions Club, have erected structures (such as a picnic shelter) in the public parks for the benefit of all. The reasonable observer is cognizant of the fact that the city's practice is to maintain all these structures and the grounds surrounding them. Given these facts, I cannot conclude that the reasonable observer would perceive that the City of Plattsmouth is endorsing religion by retaining and maintaining the donated monument.

Nor can I agree that the monument itself does nothing to detract from the perception of endorsement. Ante at 21–23 (concluding monument and surroundings are inherently religious); id. at 30 (concluding that the "inclusion of the patriotic symbol of an eagle gripping a flag on the monument impermissibly links patriotism and government to the religious teaching on the monument"). Rather, the monument is identified on its face as a gift of the Eagles. This fact informs the reasonable observer that the city itself did not invest government time and money on the monument but was presented with a granite slab that it chose to place in a public park. The fact that the monument is identified as a gift of the Eagles may not be enough to convert the monument into private religious speech that would be protected by the Supreme Court's decision in Capitol Square Review and Advisory Board v. Pinette, 515 U.S. 753 (1995), but this fact clearly diminishes any perception of endorsement. Similarly, the fact that the monument sits in a corner of Memorial Park is also important to our reasonable observer. The placement of the smallish monument in a rather remote location suggests that Plattsmouth's acceptance and display of the monument was not for the purpose of endorsing a religious message. Finally, as I have already noted, the reasonable observer is aware that the monument itself tends to highlight and emphasize the Ten Commandments' role in the Judeo-Christian and American Founding traditions.

## III.

For the foregoing reasons, I respectfully dissent from the opinion of the Court insofar as it finds Plattsmouth in violation of the Establishment Clause. Because I can perceive no religious purpose in the city's decision to allow the monument to be erected and because the principal or primary effect of the monument is not to advance or endorse religion, I would reverse the decision of the District Court.

_____