**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**November 12, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 02-51184

---

THOMAS VAN ORDEN

Plaintiff-Appellant,

versus

RICK PERRY, in his official capacity as
Governor of Texas and Chairman,
State Preservation Board;
DAVID DEWHURST, in his official capacity
as Co-Vice Chairman, State Preservation Board
and President of the Senate of Texas;
TOM CRADDICK, in his official capacity
as Co-Vice Chairman, State Preservation Board
and Speaker of the House of Representatives of Texas;
CHRIS HARRIS, in his official capacity
as Member of the State Preservation Board;
PEGGY HAMRICK, in her official capacity
as Member of the State Preservation Board;
JOCELYN LEVI STRAUS, in her official capacity
as Member of the Texas Preservation Board;
CHARLYNN DOERING, in her official capacity
as Interim Executive Director, State Preservation Board,

Defendants-Appellees.

---

Appeal from the United States District Court
For the Western District of Texas

---

Before HIGGINBOTHAM, STEWART, and PRADO, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

The plaintiff, Thomas Van Orden, asks the federal courts to order the State of Texas to remove from the grounds of the State Capitol a granite monument in which the Ten Commandments are etched. In a bench trial, the district court considered documents, testimony, and an extensive stipulation of facts filed by the parties. In a careful opinion, the court rejected the claim of First Amendment violations and entered judgment for the State. The plaintiff appeals. We affirm.

I

The Capitol, with its surrounding twenty-two acres, was dedicated on May 16, 1888. The first monument was erected on these grounds three years later. It was "a bronze statue of a Texan holding a muzzle-loading rifle atop a Texas Sunset Red granite base." Names of the Texans who died in the battle of the Alamo are inscribed on its four granite supports. Sixteen additional monuments have since been erected on the capitol grounds, a protected National Historic Landmark maintained by the State Preservation Board.[1]

The Visitor Services of the State provides tours of the Capitol Building with its historic statuary, portraits, and memorabilia, and it publishes a written guide for walking tours of

---

[1]The parties stipulated that "the Capitol, together with its grounds and the monuments erected and maintained there, constitute a National Historic Landmark." They also stipulated that "the Ten Commandments monument is an element of a legally-protected National Historic Landmark."

the grounds for visitors who wish to continue with the outdoor displays. The guided tour of the Capitol Building offers a wide array of monuments, plaques, and seals depicting both the secular and religious history of Texas. They include a tribute to African American legislators, a Confederate plaque, a plaque commemorating the donors of the granite for the building, and a plaque commemorating the war with Mexico. There is a Six Flags Over Texas display on the floor of the Capitol Rotunda featuring the Mexican Eagle and serpent - which as visitors will learn, is a symbol of Aztec prophecy - together with the Confederate Seal containing the inscription "Deo Vindice" (God will judge). Should the tour continue to the Supreme Court Building, visitors will find inscribed above the bench the phrase "Sicut Patribus, Sit Deus Nobis" (As God was to our fathers, may He also be to us). Before reaching the Supreme Court building from the Capitol, visitors will encounter four other monuments in the immediate vicinity: a tribute to Texas children; a statue of a pioneer woman holding a child in tribute to the role of women in Texas history; a replica of the Statue of Liberty; and a tribute to the Texans lost at Pearl Harbor.

The Ten Commandments monument was a gift of the Fraternal Order of Eagles, accepted by a joint resolution of the House and Senate in early 1961. It is a granite monument approximately six feet high and three and a half feet wide. In the center of the monument, a large panel displays a nonsectarian version of the text

of the Commandments. Above this text, the monument contains depictions of two small tablets with ancient Hebrew script. There are also several symbols etched into the monument: just above the text, there is an American eagle grasping the American flag; higher still, there is an eye inside a pyramid closely resembling the symbol displayed on the one-dollar bill. Just below the text are two small Stars of David, as well as a symbol representing Christ: two Greek letters, Chi and Rho, superimposed on each other. Just below the text of the commandments, offset in a decorative, scroll-shaped box, the monument bears the inscription: "PRESENTED TO THE PEOPLE AND YOUTH OF TEXAS BY THE FRATERNAL ORDER OF EAGLES OF TEXAS 1961."

The parties stipulated that (1) the sparse legislative history "contain[s] no record of any discussion about the monument, or the reasons for its acceptance, and is comprised entirely of House and Senate Journal entries"; (2) the State selected the site on the recommendation of the Building Engineering and Management Division of the State Board of Control; (3) the expenses "were borne exclusively by the Eagles"; (4) the monument requires virtually no maintenance; and (5) the dedication of the monument was presided over by Senator Bruce Reagan and Representative Will Smith. There is no official record that any other person participated.

The main entry into the Capitol Building is on its south side facing Congress Street. The monument displaying the Ten Commandments is located on the north side of the Capitol Building

on a line drawn between the Supreme Court and the Capitol Rotunda, about 75 feet from the Capitol Building, and 123 feet from the Supreme Court Building.

## II

The plaintiff argues that Texas "accepted" the monument "for the purpose of promoting the Commandments as a personal code of conduct for youths and [b]ecause the Commandments are a sectarian religious code, their promotion and endorsement by the State as a personal code contravenes the First Amendment."  He asserts that the district court's finding that the State had a secular purpose for the display is not supported by the evidence and that a reasonable viewer would perceive the display of the decalogue as a State advancement and endorsement of religion favoring the Jewish and Christian faiths.

The State replies that the display serves a secular purpose as found by the district court and a reasonable observer would not conclude that the State is seeking to advance, endorse, or promote religion by its display.  To the contrary, the State observes that the display has been in place without legal attack for over forty-two years and, viewed in context, is part of the state's commemorative display of significant events and strands of Texas history.  It argues that a reasonable person touring the Capitol Building and its historical grounds would not see the display of the decalogue as State endorsement of religion.  Rather, with its simple presentation and location between the Capitol Building and

5

the Texas Supreme Court Building, a reasonable viewer would see the monument as a recognition of the large role of the decalogue in the development of Texas law.  Equally, with its proximity to the pioneer woman holding a child and to the figures of children at play, it would be seen as a fit location to express appreciation for the work of the Eagles with American youth.

III

Through the Fourteenth Amendment, Texas is controlled by the command of the First Amendment that it "shall make no law respecting an establishment of religion."[2]  In its thirty-two year life, *Lemon v. Kurtzman*[3] has been criticized but remains a required starting point in deciding contentions that state displays of symbols and writings with a religious message are contrary to the First Amendment.  Its three-part test requires that a court consider (1) whether the government activity in question has a secular purpose, (2) whether the activity's primary effect advances or inhibits religion, and (3) whether the government activity fosters an excessive entanglement with religion.[4]  A challenged activity must survive each prong to pass constitutional scrutiny. The plaintiff here concedes that excessive entanglement, the third inquiry, is not an issue in this case.  We need only consider,

---

[2] U.S. CONST. amend. I, cl. 1.

[3] 403 U.S. 602 (1971).

[4] *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

6

then, whether Texas lacked a secular purpose and whether the primary effect of the display is to advance religion.

In refining these two tests, the Supreme Court has interpreted the First Amendment to prohibit government action that has either the purpose or effect of endorsing or disapproving of religion.[5] A display has the purpose of endorsing religion when it "'convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred.'"[6] And to determine whether it has the effect of endorsing religion we ask "what viewers may fairly understand to be the purpose of the display."[7] This is the observation of a reasonable observer, not of the uninformed, the casual passerby, the heckler, or the reaction of a single individual. Rather, the reasonable observer standard attempts to capture the "concern with the political community writ large."[8]

---

[5]*County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 600-01 (1989); *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring).

[6]*Allegheny*, 492 U.S. at 593 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring)).

[7]*Allegheny*, 492 U.S. at 595 (quoting *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring)).

[8]*See Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 779-780 (1995) (O'Connor, J., concurring in part and concurring in judgment) ("[B]ecause our concern is with the political community writ large, the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from . . . discomfort. . . . It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum

The guiding principle is government neutrality toward religion in the sense that a state cannot favor religion over non-religion or one religion over another. Yet neutrality is not self-defining. It does not demand that the state be blind to the pervasive presence of strongly held views about religion with myriad faiths and doctrines. Nor could it do so. Religion and government cannot be ruthlessly separated without encountering other First Amendment constraints, including its guaranty of the free exercise of religion. Such hostility toward religion is not only not required; it is proscribed.[9] Justice Kennedy's observation in *Allegheny* bears emphasis: it is not the case that the Establishment Clause is so inelastic as to not "permit government some latitude in recognizing and accommodating the central role religion plays in our society."[10] It is equally important to remember Justice Goldberg's famous observation:

> Neither government nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political and personal values derive historically from religious teachings. Government must inevitably take cognizance of the existence of religion. . . .[11]

---

in which the religious [speech takes place]."); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001).

[9]*See Lynch*, 465 U.S. at 673.

[10]*Allegheny*, 492 U.S. at 657 (Kennedy, J., concurring in part and dissenting in part).

[11]*School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 306 (1962) (Goldberg, J., concurring).

In sum, we recognize that proper application of First Amendment principles demands a sense of proportion and that our inquiry is fact-sensitive. Ultimately, we have the delicate task of placing this display of the decalogue in its full setting. We turn to that task, asking first if the Texas Legislature had a valid secular purpose for authorizing the installation of the monument. We will then examine whether the activity's primary effect advances or inhibits religion.

IV

A

The district court found that the purpose of the legislature was "to recognize and commend a private organization for its efforts to reduce juvenile delinquency." It gleaned this purpose from the reason stated in the Resolution granting the Eagles permission to erect the monument. The plaintiff concedes that this recited purpose is a valid secular purpose, but contends that it was not the true purpose. Rather, he argues that monuments "are not erected to honor donors and they are not erected to pay tribute [to] their acts of donation. They are erected to pay tribute to and honor the subject or ideal depicted."

The Legislature, of course, cannot dictate the finding of secular purpose by a bland recitation. The finding of the district court here, however, rests on two powerful realities. First, there is nothing in either the legislative record or the events attending the monument's installation to contradict the secular reasons laid

9

out in the legislative record, brief as it is; there is nothing to suggest that the Legislature did not share the concern about juvenile delinquency.[12]  Second, Texas has a record of honoring the contributions of donors and those they represent, contrary to plaintiff's unsupported argument.  For example, ten years before its resolution accepting the Ten Commandments monument, the Legislature authorized the Boy Scouts of America to install a replica of the Statue of Liberty.  The Legislature stated that it did so "in honor of the Boy Scouts of America."  The resolution's preamble explained that "nothing has been done to honor the youth of Texas who are members of the Boy Scouts."  Whether or not this legislative history would support a finding that the Legislature acted with only a secular purpose, the record supports the finding of the district court that the Texas Legislature had a valid secular purpose in authorizing the placement of the Ten Commandments monument.  There is nothing to suggest that the recited reason was a sham, and the State's treatment of other monuments on the Capitol grounds belies any such suggestion. Without more, then, the recited legislative purpose should be accepted.[13]

---

[12]For an example of the decalogue's installation coupled with religious ceremony, see *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 306 (7th Cir. 2000), *cert. denied*, 532 U.S. 1058 (2001).

[13]*Wallace*, 472 U.S. at 74-75; *see also Mueller v. Allen,* 463 U.S. 388, 394-395 (1983) (expressing "reluctance to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned

10

The plaintiff here argues that there is more. It can hardly be gainsaid, he contends, that in honoring the work of the Eagles in curbing juvenile misconduct by its resolution, the Texas Legislature endorsed the decalogue as a common code of conduct and implicitly promoted its religious message. This is half right. The plaintiff's contention here forgets that the Commandments have a secular dimension as well as a religious meaning. The plaintiff presumes both that its use by the Eagles was religious and that authorizing the installation of the monument itself endorsed that religious message.

The plaintiff's argument rests heavily upon the decision of the Seventh Circuit in *Books v. City of Elkhart, Indiana*.[14] In *Books*, there was evidence, found significant by the majority of its panel, that the purpose of the City of Elkhart was to promote the decalogue as a religious statement. The court found the City's statement of secular purpose suspect because it was adopted on the eve of litigation in an effort to escape scrutiny under the First Amendment. The Texas Resolution came in 1961 and was supported by statements honoring the efforts of the donor. Unlike *Books*, there was no religious service attending the acceptance of the monument in Texas. The record shows that only two state legislators attended. There is no evidence of any religious invocations or

_____

from the face of the statute.").

[14]235 F.3d 292, 306 (7th Cir. 2000), *cert. denied*, 532 U.S. 1058 (2001).

11

that any minister, rabbi, or priest were even present.  Nor is the context in which the Commandments is displayed here similar to the display in *Books*.[15]  We are not persuaded that the Resolution of the Texas Legislature in 1961 was a sham.

B

Our conclusion that the legislative authorization was supported by a valid secular purpose is reinforced by the related but distinct inquiry whether the primary effect of the display advances or inhibits religion as seen from the eyes of a reasonable observer, informed and aware of his surroundings.

The Ten Commandments have both a religious and secular message.  Given this duality, our effects inquiry must focus on the specific facts and context of the display.  As Justice Blackmun explained in *Allegheny*:

> [T]he effect of the display depends upon the message that the government's practice communicates: the question is "what viewers may fairly understand to be the purpose of the display."  That inquiry, of necessity, turns upon the context in which the contested object appears: "[A] typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content."[16]

---

[15]As we discuss in greater detail below, the context in which the Ten Commandments is displayed on the Capitol grounds is different from that at issue in *Books*, and this unique context negates any sense that the state is endorsing or promoting the decalogue's religious, as opposed to its secular, aspects.

[16]*Allegheny*, 492 U.S. at 595 (citing *Lynch v. Donnelly*, 465 U.S. at 687 (O'Connor, J., concurring, embracing Justice O'Connor's concurring opinion in *Lynch*)).

12

Returning to our earlier description of the Capitol, we note first that the grounds are designated as a National Historic Landmark that is dedicated to the display of "statues, memorials, and commemorations of people, ideals and events that compose Texan identity; these displays document the struggles and the successes that Texans have experienced in the past and serve to inspire us as we face the challenges of today."[17] The State points to the replica of the Seal of Mexico displayed on the tour path of the Capitol, reminding that it "acknowledges the mystical traditions of the indigenous people of the Southwest, who were displaced by a religious Catholic regime for some 300 years."

Relatedly, the State suggests that the decalogue in Texas is displayed in a museum setting. The State points out that the Curator of the Capitol is a professional museum curator, with an advanced degree in museum science and the Texas State Preservation Board qualifies as a museum as defined by federal statute.[18] The State Preservation Board, created in 1983, is an agency of the State of Texas and has broad authority over the Capitol Building

---

[17]*See* H. Con. Res. 38, 77th Leg., R.S. (2001).

[18]"Museum means a public or private nonprofit agency or institution organized on a permanent basis for essentially educational or aesthetic purposes that utilizes a professional staff, owns or utilizes tangible objects, cares for the tangible objects, and exhibits the tangible objects to the public on a regular basis." 20 U.S.C. § 9172 (2003).

and grounds.[19]   It employs, among others, three professional curators with graduate degrees in history and museum science.  They maintain the historic artifacts of the Capitol Collection, including an art collection with an estimated value of twenty to thirty million dollars.  This department oversees the monuments and offers educational programs and brochures, including guided tours of the Capitol Building.

We need not accept the State's museum analogy in full measure to acknowledge that, while short of the museum envisioned by Justice O'Connor, a setting  which would wholly negate endorsement, the manner in which the seventeen monuments are presented on the grounds portion of the Capitol tour supports the conclusion that a reasonable viewer would not see this display either as a State endorsement of the Commandment's religious message or as excluding those who would not subscribe to its religious statements.[20]

---

[19]TEX. GOV'T CODE ANN. §§ 443.001-443.028 (Vernon 1998 & Supp. 2004).

[20] A visitor to the Capitol would receive a brochure including "A Self-Guided Tour" with a map showing the location of the seventeen monuments.  It includes a brief description of each monument, starting with Hood's Texas Brigade, which "was erected in 1910 by surviving comrades and friends."  Similar paragraphs follow for each monument. Number 9 reads: "THE TEN COMMANDMENTS–Erected 1961 by the Fraternal Order of Eagles of Texas.  Hewn from Texas granite in the traditional shape of the biblical stones and inscribed with the Ten Commandments, the monument was presented to the people and youth of Texas."

Even those who would see the decalogue as wise counsel born of man's experience rather than as divinely inspired religious teaching cannot deny its influence upon the civil and criminal laws of this country. That extraordinary influence has been repeatedly acknowledged by the Supreme Court and detailed by scholars. Equally so is its influence upon ethics and the ideal of a just society. A reasonable viewer must also be aware of the placement of the monument at a point on the direct line between the legislative chambers, the executive office of the governor, and the Supreme Court Building. It is plainly linked with those houses of the law while standing apart and not physically connected to any of them. The decalogue is presented as relevant to these law-giving instruments of State government, but from a distance.

In 1993, the State Preservation Board had to decide where to locate the monument following a Capitol construction project that had required the removal of many monuments. The Board's executive director, in uncontroverted testimony at trial, explained that the decalogue's location was carefully chosen by the Board's professional staff to reflect the role of the Commandments in the making of law. The only change in where the monument had been located since 1961 was to turn it to face a different direction. The professional judgment of these trained museum curators, made ten years before any litigation, is relevant to our question of effect, as well as to our acceptance of the State's secular purpose in displaying the Commandments. But even if the evidence of the

15

efforts in 1993 were disregarded, it would not diminish the explanatory power of the location where the monument was placed in 1961 and has since resided.

V

History matters here.  For forty-two years, the monument has stood in Austin without the filing of any legal complaint.  This quiescence is remarkable for Travis County, the seat of state government and the home of the University of Texas, whose campus is a stone's throw away from the Capitol grounds.  This Court is well aware that Travis County is not lacking in persons willing and able to seek judicial relief from perceived interferences with constitutional rights.[21]  Had this monument been recently installed, the inference of religious purpose would have been stronger.  That it has been in place for so long adds force to the contention that the legislature had a secular purpose.  As Judge Becker observed:

> The reasonable observer would perceive an historic plaque as less of an endorsement of religion than a more recent religious display not because the Ten Commandments have lost their religious significance, but because the maintenance of this plaque sends a much different message about the religious views of the County. . . .  The reasonable observer, knowing the age of the . . . plaque, would regard the decision to leave it in place as

---

[21]*See e.g. O'Hair v. Murray*, 588 F.2d 1144 (5th Cir. 1979) (addressing a constitutional challenge to the motto "In God We Trust"); *Murray v. City of Austin, Texas*, 947 F.2d 147 (5th. Cir 1991) (examining a claim that the inclusion of a Christian cross in the insignia of the City of Austin violated the Establishment and Free Exercise Clauses).

16

motivated, in significant part, by the desire to preserve a longstanding plaque.[22]

In sum, we are persuaded that Texas does not violate the First Amendment by retaining a forty-two-year-old display of the decalogue. The Ten Commandments monument is part of a display of seventeen monuments, all located on grounds registered as a historical landmark, and it is carefully located between the Supreme Court Building and the Capitol Building housing the legislative and executive branches of government. We are not persuaded that a reasonable viewer touring the Capitol and its grounds, informed of its history and its placement, would conclude that the State is endorsing the religious rather than the secular message of the decalogue.

To say this is not to diminish the reality that it is a sacred text to many, for it is also a powerful teacher of ethics, of wise counsel urging a regiment of just governance among free people. The power of that counsel is evidenced by its expression in the civil and criminal laws of the free world. No judicial decree can erase that history and its continuing influence on our laws – there is no escape from its secular and religious character. There is no constitutional right to be free of government endorsement of its own laws. Certainly, we disserve no constitutional principle by concluding that a State's display of the decalogue in a manner that

---

[22]*Freethought Soc. of Greater Philadelphia v. Chester County*, 334 F.3d 247, 265 (3rd Cir. 2003).

17

honors its secular strength is not inevitably an impermissible endorsement of its religious message in the eyes of our reasonable observer. To say otherwise retreats from the objective test of an informed person to the heckler's veto of the unreasonable or ill-informed - replacing the sense of proportion and fit with uncompromising rigidity at a costly price to the values of the First Amendment. A display of Moses with the Ten Commandments such as the one located in the United States Supreme Court building makes a plain statement about the decalogue's divine origin. Yet in context even that message does not drown its secular message. So it is here.

AFFIRMED.