Kay STALEY, Plaintiff,

v.

HARRIS COUNTY, TEXAS, Defendant.

No. CIV.A. H–03–3411.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 10, 2004.

Randall Lee Kallinen, Attorney at Law, Houston, TX, for Kay Staley.

James Nathan Overstreet, Williams and Overstreet PC, Houston, TX, for Karen Friend, William Drout, Lisa Drout.

Frank Sanders, Harris County Attorney's Office, Houston, TX, for Harris County, Texas.

### MEMORANDUM OPINION

LAKE, District Judge.

Plaintiff Kay Staley brought this action against Harris County, Texas, seeking to permanently enjoin the County from displaying an open King James Bible in a display case located atop a stone monument near the Harris County Civil Courthouse at 301 Fannin, Houston, Texas. Staley alleges that the display of the Bible on County property violates the Establish-

ment Clause of the First Amendment to the United States Constitution. The County denies that there is any First Amendment violation because the display of which the Bible is a part has a secular purpose, does not advance religion, and does not foster excessive government entanglement with religion. On August 2 and 3, 2004, the parties presented evidence to support their contentions.

## I.

To put the parties' arguments and the evidence in context it is first necessary to summarize the relevant law. Amendment I to the United States Constitution states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition Government for a redress of grievances.

The first clause of this Amendment is commonly known as the Establishment Clause; the second clause is commonly known as the Free Exercise Clause. Although by its terms the First Amendment only applies to Congress, the Fourteenth Amendment to the Constitution prohibits states and other governmental entities from denying religious liberties guaranteed by the First Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).[1]

In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Supreme Court articulated three criteria for determining whether government action violates the Establishment Clause. Under the *Lemon* analysis the challenged state practice is permissible if (1) it has a secular purpose, (2) its primary or principal effect neither advances nor inhibits religion, and (3) it does not foster an excessive entanglement with religion. A governmental entity violates the Establishment Clause if it fails to satisfy any of these criteria. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

Unfortunately, it is difficult to find coherent guidance from the Supreme Court's later opinions applying the *Lemon v. Kurtzman* analysis. The Court's decisions are often reached by fractured majorities, with differing concurring opinions seeking to explain the result. The Court's decisions do, however, yield some general prevailing themes. In explaining the first *Lemon* criterion the Supreme Court has stated:

The purpose prong of the *Lemon* test requires that a government activity have a secular purpose. That requirement is not satisfied, however, by the mere existence of some secular purpose, however dominated by religious purposes.... The proper inquiry under the purpose prong of *Lemon* ... is whether the government intends to convey a message of endorsement or disapproval of religion.

*Lynch v. Donnelly,* 465 U.S. 668, 690–91, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'CONNOR, J., concurring).

In addressing the second *Lemon* criterion, whether the principal effect advances or inhibits religion, the Supreme Court has "paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion ...." *County of Allegheny v. American Civil Liberties Union,* 492 U.S.

---

1. Amendment XIV to the United States Constitution, ratified in 1868, states

Section 1 ... No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). The Court has explained

> that the prohibition against governmental endorsement of religion "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred.*" *Wallace v. Jaffree,* 472 U.S., at 70, 105 S.Ct., at 2497 (O'CONNOR, J., concurring in judgment) (emphasis added).... Moreover, the term "endorsement" is closely linked to the term "promotion," *Lynch v. Donnelly,* 465 U.S., at 691, 104 S.Ct., at 1368 (O'CONNOR, J., concurring), and this Court long since has held that government "may not ... promote one religion or religious theory against another or even against the militant opposite," *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270[, 21 L.Ed.2d 228] (1968).
>
> Whether the key word is "endorsement," "favoritism," or "promotion" the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community." *Lynch v. Donnelly,* 465 U.S., at 687, 104 S.Ct., at 1366 (O'CONNOR, J., concurring).

*Allegheny,* 492 U.S. at 593–94, 109 S.Ct. at 3101.

To determine whether a religious display has the effect of endorsing religion a court must determine "what viewers may fairly understand to be the purpose of the display." *Allegheny,* 492 U.S. at 595, 109 S.Ct. at 3102 (*citing Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'CONNOR, J., concurring)). "That inquiry, of necessity, turns upon the context in which the contested object appears: '[A] typical museum setting, though not neutralizing the religious context of a religious painting, ne-

gates any message of endorsement of that context.' .... 'Every government practice must be judged in its unique circumstances to determine whether it [endorses] religion.'" *Id.* (citing *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369–70).

The Fifth Circuit has explained that "[t]his is the observation of a reasonable observer, not the uninformed, the casual passerby, the heckler, or the reaction of a single individual." *Van Orden v. Perry,* 351 F.3d 173, 178 (5th Cir.2003). As Justice O'Connor explained in her concurring opinion in *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 779–80, 115 S.Ct. 2440, 2455, 132 L.Ed.2d 650 (1995),

> the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of a faith to which they do not subscribe.... [T]he endorsement test creates a more collective standard to gauge "the 'objective' meaning of the [government's] statement in the community." *Lynch, supra,* at 690, 104 S.Ct. at 1368 (O'CONNOR, J., concurring).... [T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears.

## II.

With this legal background in mind the court now turns to the history and setting of the King James Bible display and then in Part III to an application of the *Lemon* test to these facts.

The Harris County Civil Courthouse was built in 1910 and is owned and operated by Harris County, Texas, a political subdivision of the State of Texas. The Courthouse is located at 301 Fannin Street, in an area of downtown Houston containing many other county government

buildings. The Courthouse is an imposing, six-story, granite building that occupies the center of an entire city block between Congress and Preston Streets and Fannin and San Jacinto Streets. The Courthouse originally housed all county and state courts and county government offices. Over the years as other county courthouses and county buildings were erected the building was designated as a Civil Courthouse and currently houses 18 courts, as well as the county and district clerks' offices.

In 1953 the Star of Hope Mission, a local Christian charity that provides food and shelter to indigents, decided to build a memorial to William S. Mosher, a prominent Houston businessman and philanthropist who died in 1948. Mosher had been a long-time, active supporter of the Star of Hope Mission. Carloss Morris, the president of the Star of Hope Mission, approached the Harris County Commissioners Court and secured permission to erect a memorial to Mosher on the County Courthouse property. Morris testifies that the Star of Hope Mission selected a location in front of the Courthouse because of the permanence and prominence of its location.

The Star of Hope Mission designed and paid for the Mosher monument. It was erected in 1956 in a plaza 21 feet from the main, Fannin Street, entrance to the Courthouse. The monument measures two-feet-six-inches by three feet and is four-feet-five-inches high. Engraved on the front surface of the monument, and occupying most of the area of the front surface, is the following inscription:

STAR OF HOPE
MISSION
ERECTED IN LOVING MEMORY
OF
HUSBAND & FATHER
WILLIAM S. MOSHER
A.D.1956

The top part of the monument is a glass-topped display case that is sloped towards the Courthouse entrance. The Star of Hope Mission placed an open Bible in the glass display case to memorialize Mosher's Christian faith.[2] There are no other items in the display case. The sloping top of the monument with the Bible has the appearance of a lectern. There is no written explanation on the monument as to why the Bible is there. A public ceremony, which included Christian prayers, was held in 1956 to dedicate the Mosher monument.

Morris testified that one of the Star of Hope's purposes for including the open Bible in the display was to convey to the public that Mosher was "a godly man" who had helped others. The Bible in the display case was intended to represent Mosher's Christianity. Morris also testified that the presence of the Bible in the monument conveys to people that this is a Christian government.

Because the Mosher monument faces the main entrance to the Courthouse, it is readily visible to attorneys, litigants, jurors, witnesses, and other visitors to the Courthouse. However, a passerby would have to walk up to the monument to observe that it contains a Bible and would have to stand in front of it to read the Bible. The open Bible as displayed measures twelve-by-sixteen inches.

There are two wall plaques and two free-standing historical markers in the

---

**2.** Minutes from 1953 and 1956 meetings of the Star of Hope Board of Directors refer to the Mosher monument as "the Bible stand memorial" [Plaintiff's Exhibits 24 and 24A], "the Bible Memorial" [Plaintiff's Exhibit 24B], and "the Bible Stand" [Plaintiff's Exhibit 24C].

same area as the Mosher monument. Neither the plaques nor the historical markers contain any religious message. No other open books are displayed in or near the Courthouse. There are other monuments, markers, and plaques in and near other county buildings, but none of them contain a religious message.

The Star of Hope Mission maintained the monument from 1956 until 1995. The monument was vandalized several times and the Bible stolen. Each time the Star of Hope Mission replaced the Bible. In 1988 atheists complained about the Bible to the Harris County Commissioners Court and asked that it be removed. Although the evidence on this point is not entirely clear, it appears that the Star of Hope Mission decided either to remove the Bible or not to replace it again, rather than face potentially costly litigation. From 1988 until 1995 the top of the monument remained open and empty, and it was often used as a trash bin.

In 1995 John Devine was elected a state district judge. Devine campaigned on a platform of putting Christianity back into government. As a judge he initially officed in a county building near the Civil Courthouse and later moved to the Courthouse. His official court reporter was Karen Friend. In 1995 Devine and Friend embarked on a project to solicit private donations to refurbish the Mosher monument, which had fallen into a state of disrepair, to restore a Bible to the display case, and to add neon lighting to the display case.

Devine sought and obtained approval from Harris County to make the improvements. Harris County did not pay for any of the improvements to the monument or for the new Bible. A ceremony was held in November of 1995 to commemorate the refurbishing of the monument and the replacement of the Bible. A number of Christian ministers led prayers at the red-edication ceremony. Spectators and participants sang "The Battle Hymn of the Republic," a patriotic hymn that extols Christ's glory.

In 1996 and again in 1998 Friend paid to repair the lights in the display case and for repairs to the display case to protect the Bible from moisture. Since 1995 Harris County has paid for electricity to illuminate the neon lights that were installed in 1995. The cost of providing this electricity is $93.16 per year. For a few years after the monument was refurbished Friend turned the pages of the Bible and selected the pages to display. Since 1997 the Star of Hope Mission has maintained the monument and turned the pages of the Bible. Although Harris County does not maintain the Mosher monument, it retains the authority to move or alter it.

Kay Staley is a resident and taxpayer of Harris County. She is also an attorney who passes by the monument going to and from the Courthouse in the course of her profession. She testified that she is offended by the Bible display in the Mosher memorial because it advances Christianity and it sends a message to her and to non-Christians that they are not full members of the Houston political community.

After Staley filed this action asking that the County be ordered to remove the Bible display, supporters of the Bible display held a large rally on September 4, 2003, in the Courthouse plaza next to the Mosher monument. Several hundred rally participants prayed and stressed that the Bible was a foundation of the Christian faith. County Judge Robert Eckels, Judge Devine, and Harris County Attorney Mike Stafford spoke at the rally and participated in prayers led by Christian ministers. Eckels and Stafford stated that the County would strongly oppose the lawsuit. The County Judge is the chief executive officer of Harris County. He presides over meet-

ings of the Harris County Commissioners Court, the legislative body that establishes County policy.

## III.

### A. County Responsibility

■ Harris County first argues that it bears no legal responsibility in this action. Citing *Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), the County argues that because the County does not own or maintain the monument, the Bible display should be considered a private expression of free speech by the Star of Hope Mission, and the County should bear no responsibility under the Establishment Clause. The court is not persuaded by this argument.

*Pinette* involved a 10–acre, state-owned square surrounding the courthouse in Columbus, Ohio. "For over a century the square ha[d] been used for public speeches, gatherings, and festivals advocating and celebrating a variety of causes, both secular and religious." *Pinette*, 515 U.S. at 757, 115 S.Ct. at 2444. For many years the Capitol Square Review and Advisory Board allowed a number of diverse groups to erect booths, art exhibits, and unattended displays on Capitol Square.

The issue in *Pinette* was whether the Board was justified in denying an application by the Ohio Ku Klux Klan to place a cross on the square for three weeks in December of 1993 based upon the Board's conclusion that allowing the cross would violate the Establishment Clause. The Supreme Court's conclusion that the proposed cross would not violate the Establishment Clause was driven by the fact that "Capitol Square is a genuinely public forum, is known to be a public forum, and has been widely used as a public forum for many, many years." 515 U.S. at 767, 115 S.Ct. at 2449.

Unlike in *Pinette*, there was no evidence in this case that the area surrounding the Courthouse has been designated or used as a traditional public forum for erecting booths or displays. Unlike in *Pinette*, the Bible display is also permanent, and there was no evidence that the County allowed private groups, whether religious or secular, to erect permanent monuments on the Courthouse grounds.

The County's argument is similar to arguments advanced by defendants in *County of Allegheny v. American Civil Liberties Union*. There the defendants argued that a sign disclosing that the crèche prominently displayed on the main staircase of the county courthouse was owned by a Roman Catholic organization showed that the religious organization, not the county, was promoting a Christian message. The Supreme Court rejected this argument, holding that

> the Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations.... Thus, by prohibiting government endorsement of religion, the Establishment Clause prohibits precisely what occurred here: the government's lending its support to the communication of a religious organization's religious message.

492 U.S. at 600–601, 109 S.Ct. at 3105.

In this case County officials approved both the original inclusion of the Bible in the Mosher memorial monument in 1956 and its reintroduction in 1995. By allowing an open Bible to be displayed in front of the main entrance to the Courthouse, the County has allowed the communication of the Christian religious message that the Star of Hope Mission and Judge Devine sought to advance. Accordingly, the County is responsible if the presence of

the Bible in the Mosher monument violates the Establishment Clause. *See Santa Fe Independent School Dist. v. Doe,* 530 U.S. 290, 303, 120 S.Ct. 2266, 2275–76, 147 L.Ed.2d 295 (2000) (emphasizing that selective access to government property does not create a public forum, moreover, the "mere creation" of a public forum does not "shield[ ] the government entity from scrutiny under the Establishment Clause") (*citing Pinette,* 515 U.S. at 772, 115 S.Ct. 2440).

### B. *Purpose and Effect of the Bible Display*

■ In arguing that the Mosher memorial has a secular purpose, the County focuses on the stone monument itself, not the Bible that sits atop it. The Mosher monument serves the secular purpose of honoring the memory of a respected Houston citizen. But plaintiff would have no complaint were the issue merely an empty monument to Mr. Mosher. Plaintiff's complaint is with the Bible display.

The issues in this case are whether the evidence establishes a secular purpose for the Bible display and whether the setting in which the Bible appears and the facts related to its installation in 1956 and its refurbishing in 1995 support the conclusion that a reasonable viewer would see the Bible display as an endorsement of religion.

The King James Bible can advance both secular and religious purposes:

> The two greatest influences on the shaping of the English language are the works of William Shakespeare and the English translation of the Bible that appeared in 1611. The King James Bible—named for the British king who ordered the production of a fresh translation in 1604—is both a religious and literary classic.

.    .    .    .    .    .

> [T]he Bible is far more than a work of literature. For Christians—the world's largest religious grouping—the Bible tells the story of the creation of the world by God, and its redemption through Jesus Christ. The Bible speaks words of hope in the face of suffering and death. It tells of a New Jerusalem, in which pain, sorrow, and death are things of the past.

Alister McGrath, *In the Beginning The Story of the King James Bible and How it Changed a Nation, a Language, and a Culture* 1–2 (Anchor Books 2002).

The Bible can have a secular purpose, for example, when read as literature in a classroom or in studying the development of the English language. *See Stone v. Graham,* 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980). But no one has suggested such a secular purpose in this case.

The court concludes that although the primary purpose of the Star of Hope Mission for erecting the stone monument was to honor William S. Mosher, the purpose for installing the open Bible in the glass display case was to commemorate Mosher's Christian faith. The monument by itself, without the Bible, honors Mosher and his affiliation with the Star of Hope Mission. But, Mosher was a devout Christian, and the Star of Hope Mission chose to honor his Christian faith by prominently displaying an open Bible atop the memorial monument to him. The Bible is clearly an "instrument of religion." *School District of Abington Township, Pennsylvania v. Schempp,* 374 U.S. 203, 224, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963). The religious purpose of the original Bible display is evidenced by the facts that minutes of the Star of Hope Mission's board consistently refer to the Bible, that the dedication ceremony included Christian prayers, and that the President of the Star of Hope Mission, who conceived of the monument

and obtained the County's permission for it, believes that the purpose of the Bible was to honor and promote Mosher's Christian faith.

The facts surrounding the refurbishing of the monument in 1995 and its purpose since then also evidence a religious, not a secular, purpose. Neither Judge Devine nor Karen Friend knew Mosher or had any relationship with him, his family, or with the Star of Hope Mission. Their purpose in refurbishing the monument was to replace the Bible and make its presence more prominent by adding lighting to the display case. The circumstances surrounding the monument's refurbishment may be considered in determining the purpose of the refurbishment. *See Books v. City of Elkhart, Indiana,* 235 F.3d 292, 303–04 (7th Cir.2000), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001) (holding that despite the County's stated secular purposes of providing a code of conduct and recognizing the historical and cultural significance of the Ten Commandments, the circumstances surrounding the Ten Commandments monument, including dedication speeches by prominent religious leaders, demonstrated that the purpose of displaying the Ten Commandments "was to promote religious ideals").

By its nature and setting, even without the testimony regarding the original purpose of the Bible in the monument and the testimony of those who replaced the Bible in 1995, the court concludes that the purpose of the Bible display is to encourage people to read the Bible. What other purpose could there be for prominently displaying an open Bible in an illuminated case tilted toward passersby in a heavily frequented plaza in front of the main entrance to the Courthouse? As the Supreme Court explained in a related context in *Stone v. Graham:*

> If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.

449 U.S. at 42, 101 S.Ct. at 194.[3]

Given the Bible's setting, the 1995 Christian ceremony held to commemorate its return to the Mosher monument, the 2003 Christian rally held in opposition to its removal, the presence of Harris County officials at both events, and the absence of any explanation for the presence of the open Bible, the court also concludes that a reasonable observer would understand that Harris County endorses the Bible and encourages its citizens to read it. *See, e.g., Glassroth v. Moore,* 335 F.3d 1282 (11th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 497, 157 L.Ed.2d 404 (2003); *Adland v.*

---

**3.** The County notes in its briefs that the Fifth Circuit has stated that state action challenged under the Establishment Clause can satisfy the first criterion of the *Lemon* test if that action has "a" valid secular purpose, "even if that secular purpose is but one in a sea of religious purposes." *Freiler v. Tangipahoa Parish Bd. of Educ.,* 185 F.3d 337, 344 (5th Cir.1999) (*citing Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985)). However, *Wallace,* upon which the Fifth Circuit relied, describes the first *Lemon* criterion as requiring that the challenged state action have "a *clearly* secular purpose."

*Wallace,* 472 U.S. at 56, 105 S.Ct. at 2489 (emphasis added). Furthermore, the Court concluded in *Wallace* that, despite the defendants' recitation of secular purposes, the evidence showed that the challenged state action "was not motivated by any clearly secular purpose—indeed, the statute had *no* secular purpose." *Id.* (striking down a statute authorizing daily meditations or prayers in Alabama schools) (emphasis in original). The facts of this case refute the County's argument that the Bible display had any secular purpose, let alone a "clearly secular purpose."

*Russ,* 307 F.3d 471 (6th Cir.2002), *cert. denied,* 538 U.S. 999, 123 S.Ct. 1909, 155 L.Ed.2d 826 (2003); *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766 (7th Cir.2001), *cert. denied,* 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002); *Books v. City of Elkhart,* 235 F.3d 292 (7th Cir. 2000), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001) (all holding that installation on government property of monuments prominently displaying the Ten Commandments would suggest to reasonable observers that the government endorsed the religion represented by that text and discussing the circumstances surrounding the monuments' installations, which demonstrated government officials' involvement).

Although the County argues that Judge Eckels and County Attorney Stafford were not appearing in their official capacities at the September 4, 2003, rally and that their comments at the rally did not legally bind Harris County, the court concludes that a reasonable observer would believe that they were speaking for Harris County, particularly since these County officials appeared at the rally during business hours, referred to their County affiliations, and described the County's reaction to the lawsuit.

To understand how the court reached these conclusions it is instructive to compare the facts of this case with other cases in which religious symbols have faced constitutional scrutiny.

In *Van Orden,* 351 F.3d 173, the Fifth Circuit addressed the constitutionality of a granite monument erected on the grounds of the Texas State Capitol in which the Ten Commandments were etched. The Fifth Circuit noted that the Ten Commandments have a secular as well as a religious meaning and that the monument containing the Ten Commandments was one of a number of monuments erected on the capitol grounds. The court noted that

"there was no religious service attending the acceptance of the monument .... [and][t]here is no evidence of any religious invocations or that any minister, rabbi, or priest was ever present." 351 F.3d at 179.

Perhaps the clearest dichotomy of what is and is not permissible under the Establishment Clause is provided by the holding in *Allegheny.* In that case a civil liberties organization and certain individuals sued Allegheny County and the City of Pittsburgh to enjoin two holiday displays: a crèche placed on the grand staircase of the Allegheny Courthouse and a Chanukah menorah placed outside a city-county building next to a Christmas tree and a sign saluting liberty. "The crèche include[d] figures of the infant Jesus, Mary, Joseph, the farm animals, shepherds, and wise men all placed in or before a wooden representation of a manger, which has as its crest an angel bearing a banner that proclaims 'Gloria in Excelsis Deo!'" 492 U.S. at 580, 109 S.Ct. at 3094. No figures of Santa Claus or other decorations appeared on the grand staircase. A block away, outside a different city-county building, city employees had erected a 45–foot tree with lights and ornaments. A few days later the city placed at the foot of the tree a sign with a proclamation by the mayor entitled "Salute to Liberty." The city also placed in the same location an 18–foot Chanukah menorah of an abstract tree and branch design. The tree, liberty proclamation, and menorah were removed the following January.

The Supreme Court held that the crèche on the courthouse stairway violated the Establishment Clause, but that the menorah did not. The Court held that

the crèche sits on the Grand Staircase, the "main" and "most beautiful part" of the building that is the seat of county government .... No viewer could reasonably think that it occupies this location without the support and approval of

the government. Thus, by permitting the "display of the crèche in this particular physical setting," ... the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message.

492 U.S. at 599–600, 109 S.Ct. at 3104.

The Court observed that "[t]he display of the Chanukah Menorah in front of the City–County Building may well present a closer constitutional question." 492 U.S. at 613, 109 S.Ct. at 3111. Although the menorah was a religious symbol, it also had secular dimensions. The menorah stood next to a Christmas tree and a sign saluting liberty, neither of which were religious symbols. The Court explained that the city could celebrate both Christmas and Chanukah as secular holidays. The Court also noted that the large tree was the predominant element of the city's display and that the mayor's sign saluting liberty and Pittsburgh's legacy of freedom further diminished the possibility that the menorah would be interpreted as an endorsement of Judaism. The Court concluded:

> Given all these considerations, it is not "sufficiently likely" that residents of Pittsburgh will perceive the combined display of the tree, the sign, and the menorah as an "endorsement" or "disapproval ... of their individual religious choices."

492 U.S. at 620, 109 S.Ct. at 3115 (citations omitted).

The facts of the present case are readily distinguishable from the Ten Commandments approved in *Van Orden* and the menorah that passed scrutiny under the endorsement-prong of the *Lemon* test in *Allegheny*. The facts here are more analogous to the crèche display held unconstitutional in *Allegheny*. In this case:

(1) Like the crèche in *Allegheny*, the Bible is prominently displayed by itself in a courthouse setting.

(2) Like the crèche in *Allegheny*, but unlike the menorah in *Allegheny*, the Bible sits by itself; it is not part of a larger display of other objects.

(3) Unlike the menorah in *Allegheny*, there is no sign explaining the presence of the Bible.

(4) Unlike the Ten Commandments in *Van Orden*, the original dedication of the Mosher memorial monument in 1956 and the ceremony that accompanied its refurbishment in 1995 included Christian prayers and hymns and addresses by Christian ministers.

(5) Unlike the Ten Commandments in *Van Orden*, there is direct evidence from the person who conceived of the Mosher memorial monument and from those who refurbished the Mosher monument and returned the Bible that the purpose for the inclusion of the Bible was to honor Mr. Mosher's Christian faith.

## IV.

Some witnesses at trial stated that requiring the removal of the Bible from the Mosher monument would send the message that religion serves no role in our society, and that government is hostile to religion.

This nation has a strong religious heritage. Two of the four principal migrations from England to America were motivated by a desire to freely exercise different religious beliefs. Thousands of Puritans settled in Massachusetts between 1629 and 1641. Over 20,000 Quakers settled in New Jersey, Pennsylvania, and Delaware in the late 1600s and early 1700s.[4] Religion

---

4. George Brown Tindall and David E. Shi, *America: A Narrative History* 85 (3rd

played an important role in colonial life. But the colonists, reflecting their European heritage of state-sponsored religion, soon began to establish state-supported churches and to persecute those of different faiths. *See Everson v. Board of Education of Ewing Tp.*, 330 U.S. 1, 9–10, 67 S.Ct. 504, 508–09, 91 L.Ed. 711 (1947).[5] The Colonial experience taught the drafters of the Bill of Rights that the new national government should not enforce any particular belief but that neither should the national government prohibit the free exercise of religion. *The government should be neutral:* It should neither support nor oppose religion or any particular religious practice. As the Supreme Court explained in *Everson,*

> [t]he people [in Virginia], as elsewhere, reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group.

330 U.S. at 11, 67 S.Ct. at 509.

In the context of this case religious neutrality means that Harris County should not be seen as endorsing Christianity. But that does not mean that by requiring the removal of the Bible from the Mosher monument, this court, the drafters of the Bill of Rights, or the United States government are hostile to religion. It means that everyone is free to adopt and practice his or her own faith, or not to adopt any form of faith, without any pressure, direct or implied, from government.

As the Supreme Court explained in *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203, 226, 83 S.Ct. 1560, 1574, 10 L.Ed.2d 844 (1963),

> [t]he place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality. Though the application of that rule requires interpretation of a delicate sort, the rule itself is clearly and concisely stated in the words of the First Amendment.

When, as in this case, a Bible is displayed in a prominent public setting, with no explanation of its purpose, a reasonable viewer with knowledge of the Courthouse and its plaza, the Bible display, the ceremony commemorating the refurbishment of the monument, and the protests subsequently held at that monument would conclude that the Bible display conveys the message that Christianity is favored or preferred by Harris County.

The court concludes that Harris County has failed the first two elements of the *Lemon* test. The Bible atop the Mosher monument does not have a secular purpose, and the primary or principal effect of the Bible display is to advance religion.

---

ed.1992).

**5.** As one prominent historian of 18th century America explains:

> [All of] the colonies ... except Rhode Island—which provided complete religious freedom for all Christians and toleration for others—imposed limitations upon various sects; no colony gave full rights to Catholics or Jews; and most colonies had tax-supported denominational establishments. Penalties for dissenters, apostates, blasphemers, and idolators were numerous and severe.

Forrest McDonald, *Novus Ordo Seclorum* 42 (U.P. Kansas 1985).

The court therefore concludes that the Bible display violates the Establishment Clause of the First Amendment to the United States Constitution.[6]

## V.

The Civil Rights Attorneys' Fees Act, 42 U.S.C. § 1988, provides that the court should award the prevailing party in this action reasonable attorney's fees. To determine a reasonable attorney's fee the court multiplies the reasonable and necessary time expended by the customary hourly rate for the legal work performed. *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974) (In certain cases the court can adjust the attorney's fees upward or downward, but no adjustments are relevant in this case.). The court concludes that plaintiff's attorney reasonably expended 163.6 hours for legal work in this case and that his reasonable rate is $225 per hour, resulting in reasonable and necessary attorney's fees of $36,810.00. The court also concludes that plaintiff incurred reasonable and necessary expenses of $3,776. These fees and expenses will be awarded to plaintiff.

### FINAL JUDGMENT

In accordance with the court's Memorandum Opinion, the court **ORDERS, ADJUDGES,** and **DECREES** that

(1) Harris County remove the Bible from the Mosher monument within ten days from the entry of this Final Judgment; and that

(2) Harris County pay to plaintiff, Kay Staley, the sum of $40,586.00 in attorney's fees and expenses within ten days from the entry of this Final Judgment.

This is a **FINAL JUDGMENT.**

---

6. Since the County has failed the first two criteria, the court need not address the third *Lemon* criterion: entanglement. Moreover, the Supreme Court's most recent discussion of the *Lemon* test's entanglement criterion characterized it as "folded" into the "primary effect" inquiry:

> In *Agostini v. Felton,* 521 U.S. 203, 218, 232–233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), we folded the entanglement inquiry into the primary effect inquiry. This made sense because both inquiries rely on the same evidence, *see ibid.,* and the degree of entanglement has implications for whether a statute advances or inhibits religion, *see Lynch v. Donnelly,* 465 U.S. 668, 688, 104

S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'CONNOR, J., concurring).

*Zelman v. Simmons–Harris,* 536 U.S. 639, 668–69, 122 S.Ct. 2460, 2476, 153 L.Ed.2d 604 (2002) (O'CONNOR, J., concurring). The Court then proceeded to characterize the current Establishment Clause test (be it a two-or three-prong test) as "basically the same as that set forth in *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) ..., over 40 years ago." In other words, even in pursuing the "entanglement" analysis, a court's central concern must be whether the challenged state action has the "primary effect" of endorsing or inhibiting religion, the issue addressed above.